State of Nebraska, appellee, v.
Trevor S. Case, appellant.
___ N.W.2d ___

Filed January 17, 2020.    No. S-18-1197.

1. **Jury Instructions: Appeal and Error.** Whether jury instructions are
   correct is a question of law, which an appellate court resolves indepen-
   dently of the lower court's decision.
2. **Pretrial Procedure: Appeal and Error.** Trial courts have broad dis-
   cretion with respect to sanctions involving discovery procedures, and
   their rulings thereon will not be reversed in the absence of an abuse
   of discretion.
3. **Convictions: Evidence: Appeal and Error.** Regardless of whether
   the evidence is direct, circumstantial, or a combination thereof, and
   regardless of whether the issue is labeled as a failure to direct a verdict,
   insufficiency of the evidence, or failure to prove a prima facie case, the
   standard is the same: In reviewing a criminal conviction, an appellate
   court does not resolve conflicts in the evidence, pass on the credibility
   of witnesses, or reweigh the evidence; such matters are for the finder
   of fact, and a conviction will be affirmed, in the absence of prejudicial
   error, if the evidence admitted at trial, viewed and construed most favor-
   ably to the State, is sufficient to support the conviction.
4. **Jury Instructions: Proof: Appeal and Error.** To establish reversible
   error from a court's refusal to give a requested instruction, an appel-
   lant has the burden to show that (1) the tendered instruction is a correct
   statement of the law, (2) the tendered instruction is warranted by the
   evidence, and (3) the appellant was prejudiced by the court's refusal to
   give the tendered instruction.
5. **Self-Defense: Jury Instructions.** A trial court is required to give a self-
   defense instruction where there is any evidence in support of a legally
   cognizable theory of self-defense.
6. **Self-Defense: Jury Instructions: Evidence.** It is only when the evi-
   dence does not support a legally cognizable claim of self-defense or the

evidence is so lacking in probative value, so as to constitute a failure of proof, that a trial court may properly refuse to instruct a jury on a defendant's theory of self-defense.

7. **Self-Defense.** To successfully assert the claim of self-defense, a defendant must have a reasonable and good faith belief in the necessity of using force and the force used in defense must be immediately necessary and justified under the circumstances.

8. \_\_\_\_. If a defendant has unjustifiably placed himself or herself in harm's way, a court may properly find that such facts do not support a lawful claim of self-defense.

9. **Criminal Law: Pretrial Procedure.** Discovery in a criminal case is generally controlled by either a statute or a court rule.

10. **Motions for Continuance: Evidence: Waiver.** If a continuance would have been a sufficient remedy for a belated disclosure in violation of Neb. Rev. Stat. § 29-1912 (Reissue 2016), a defendant who fails to request a continuance waives any rights he or she may have had pursuant to § 29-1912.

11. **Criminal Law: Evidence: Appeal and Error.** When a criminal defendant challenges the sufficiency of the evidence upon which a conviction is based, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

Appeal from the District Court for Lancaster County: Susan I. Strong, Judge. Affirmed.

Joseph D. Nigro, Lancaster County Public Defender, and Matthew Meyerle for appellant.

Douglas J. Peterson, Attorney General, and Matthew Lewis for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Miller-Lerman, J.
## NATURE OF CASE
Trevor S. Case appeals his conviction and sentence in the district court for Lancaster County for assault by a confined person. A jury found Case guilty, and the court thereafter

sentenced him to 365 days in jail followed by postrelease supervision for 12 months. Case claims on appeal that the court erred when it refused his proposed self-defense instruction and when it admitted a recording of a telephone call he made from jail. He also claims there was not sufficient evidence to support his conviction. We affirm Case's conviction and sentence.

## STATEMENT OF FACTS

On February 16, 2018, Case, who was confined in the Lancaster County jail, got into an altercation with Kenneth Burley, who was also confined in the jail and who had been a cellmate with Case. As a result of the altercation, the State charged Case with a Class IIIA felony, assault by a confined person, in violation of Neb. Rev. Stat. § 28-932 (Reissue 2016).

On the first day of trial, the court considered certain pretrial motions. Among those was Case's objection to admission of a recording of a telephone call he had made shortly after the altercation and in which he made certain statements regarding the event. Case objected to admission of the recording because the State had provided the recording to Case only the day before trial, which he noted was well beyond the time the State was required to provide evidence pursuant to the court's discovery order. Case asserted that the recording fit within the scope of the discovery statute, Neb. Rev. Stat. § 29-1912(1)(f) (Reissue 2016), which requires production of "[d]ocuments, papers, books, accounts, letters, photographs, objects, or other tangible things of whatsoever kind or nature which could be used as evidence by the prosecuting authority." The State contended that the recording was not subject to § 29-1912. The State further contended that it had become aware of the existence of the recording only the night before it provided it to Case and that because it had provided the evidence to Case, it did not think that "the remedy here is that it be excluded" but that the defense, if it thought it needed additional time,

"could ask for a continuance." After hearing the arguments of the parties, the court overruled Case's objection. Case did not thereafter move for a continuance.

The first witness for the State was William McGlothlin, who was a security manager for the Lancaster County jail. He testified regarding his duties, which included keeping records of persons confined in the jail, maintaining surveillance videos recorded in the jail, and maintaining recordings of telephone calls made from the jail by inmates. Based on knowledge obtained in performing these duties, McGlothlin testified that both Case and Burley were inmates at the jail on February 16, 2018, and that on that date, they were both in the same housing unit, which contained 32 cells. McGlothlin provided foundation for admission of a disc containing surveillance video recordings that showed the altercation between Case and Burley; the disc contained video from two cameras showing the incident from two different angles. Case did not object to admission of the video recordings.

McGlothlin also provided foundation for admission of the recording of a telephone call made from the jail on February 19, 2018. McGlothlin testified that the call was made using a personal identification number that was specific to Case. Case objected to admission of the recording of the telephone call on the basis of foundation. Case maintained that it had not been established that the voice on the call was his. The court overruled the objection. Case also renewed the objection he had made prior to trial and continues to assert on appeal based on the State's failure to comply with the discovery order. The court also overruled that objection and admitted the recording of the telephone call into evidence. Although both the video recordings and the telephone recording were admitted into evidence during McGlothlin's testimony, neither was published to the jury at that time.

On cross-examination by Case, McGlothlin testified that Case and Burley had been cellmates between December 19 and 31, 2017. McGlothlin testified generally regarding reasons

inmates might be moved from one cell to another, but he did not testify regarding reasons Case and Burley were no longer assigned to the same cell. McGlothlin also testified that Case had had no significant disciplinary problems prior to the February 16, 2018, incident.

The State's next witness was Zachary Yost, a correctional officer who was working at the Lancaster County jail on February 16, 2018. On that date, he was assigned to the housing unit in which both Case and Burley were housed. Yost testified that he was at the officer station in the unit when he heard a noise, looked up, and witnessed a physical altercation between Case and Burley. At the time he looked up, both were "throwing closed-fist punches." Yost got up from his desk, called for assistance, and made his way toward the altercation, giving loud verbal commands for the two to stop fighting and for the other inmates to return to their cells. Yost testified that when he first gave the commands, both Case and Burley remained engaged in a physical altercation. When he approached the two, Yost "used [his] right arm to deflect . . . Case from . . . Burley." Burley had stopped throwing punches, but Case continued. Case thereafter "stopped throwing punches, but . . . still continued to posture and advance on . . . Burley." At that time, Burley "had put his hands down and had turned" away. When additional staff arrived, Yost placed Burley in restraints while someone else placed Case in restraints. Both were escorted out of the housing unit and Yost did not have further interaction with either Case or Burley that day. Yost further testified that he had been working the 2 or 3 days prior to the incident and that in the days leading up to the altercation, Case had not told him that he was having any sort of difficulties with Burley.

The surveillance video that had been admitted into evidence during McGlothlin's testimony was played for the jury during Yost's testimony. Yost testified that he had reviewed the video and that it accurately depicted the altercation between Case and Burley. During the playing of the video, counsel for the State

occasionally paused the video to ask Yost questions regarding what was depicted. Yost noted that the video included footage from two cameras that showed different angles on the altercation and that one of the two did not show the beginning of the altercation.

Yost testified that it was common for inmates to walk in circles around the housing unit as some inmates were depicted doing in the video. Yost identified Burley as a person in the video who was walking counterclockwise with another unidentified inmate. At a later point in the video, Yost identified Case as the person who walked out of one of the cells on the outer edges of the area depicted; Yost testified that Case was coming out of his own cell. The video shows that Case came out of his cell and proceeded in a clockwise direction directly toward Burley. Yost testified that in order to be let out of the cell, Case would have needed to request an officer at the control kiosk to allow him to do so. Yost further identified Case and Burley as the persons in the video who began fighting and himself as the person who came to intervene.

The recording of the telephone call was also played for the jury during Yost's testimony. Prior to the recording's being played, Yost testified that he had listened to the recording and that he was familiar with Case's voice. Yost testified that the voice of the person placing the call was Case's and that one of the voices heard during the call was Case's. In the recording, the person identified by Yost as Case appeared to be discussing the altercation with Burley with an unidentified person. At one point, the other person asked, "Did he attack you or did you go for him?" and the person identified as Case responded, "I went for him."

The State's next witness was Burley. He testified that on February 16, 2018, he was an inmate in the Lancaster County jail. He was "doing laps" and talking with another inmate when Case came up to them and said, "'Stop hitting my door.'" Burley denied having hit Case's door. According to Burley, after Case made the accusation, Burley "proceeded to walk off"

and Case "start[ed] viciously attacking [him] . . . kept coming towards [him], consistently, persistently." Burley testified that he backed up from Case and told him he did not want to fight. When asked who threw the first punch in the altercation, Burley testified, "He attacked me viciously, striking me in the face, as well as throwing me to the ground. People were trying to break it up, and he's still coming towards me . . . ."

Burley also testified regarding injuries he received in the altercation. The injuries included swelling in his face, the back of his head, and near his ear, as well as his ankle. Burley further testified that he and Case had previously been cellmates for "several days" and that Burley had been moved to a different cell. Case was serving as an inmate porter, and Burley testified that the reason for the move was because he and Case kept different hours. Burley explained that he needed to be in a bottom bunk because of a disability and that therefore, the move would allow him to get better sleep. Burley testified that prior to the altercation, he had not had any issues with Case and had not bullied or threatened Case.

The State played the surveillance video during Burley's testimony and asked him questions about what was depicted. Burley identified Case as a person depicted in the video and stated that Case could be seen coming "[s]traight out the cell . . . coming straight towards me." Burley testified that at the point when the altercation began, he "tried to take a step away from [Case]." When counsel for the State noted that it appeared in the video that Burley "didn't take a step backwards" but instead "took a step forward," Burley testified that he was "trying to walk away, away from him, get away from this gentleman." Burley testified that after the initial punches, he was "bouncing back, still constantly bouncing back, and [Case was] still persistently coming towards [him]." Burley noted that at one point, he was "on the ground" with Case "on top of [him]." He testified that he ended up on the ground because of the "force of [Case's] punches and his anger, his rage." When asked about some movements he

made that were depicted in the video as occurring before the altercation began, Burley testified that he was showing the person with whom he was walking "how a previous fight [there] happened" but that he was not involved in that previous fight.

The final witness in the State's case in chief was John Winter, a Lincoln police officer who investigated the altercation between Case and Burley. As part of his investigation, Winter had watched the surveillance video and had interviewed both Case and Burley. Winter testified that photographs that had been admitted into evidence accurately depicted injuries to both Case and Burley.

Winter testified that when he interviewed Case, he had advised Case of his *Miranda* rights and Case had waived his right to counsel before talking to Winter. Winter testified that Case said that he and Burley had previously been cellmates and that he "had been having issues with . . . Burley, in the sense that . . . Burley was making statements . . . that were untrue about him." Case further described to Winter that Burley had been "coming by his cell door and lightly tapping on the cell door, just loud enough to cause [Case] annoyance, but not loud enough to draw any more attention." Case told Winter that Burley was "sort of a bully" and that he had told correctional staff about issues he had had with Burley. Winter testified that Case said that because staff had "failed to take any action" to fix his issues with Burley, on the day of the altercation Case determined "he was going to go handle the situation himself and that's why he ended up speaking with . . . Burley." After making that statement, Case declined to elaborate in more detail regarding the altercation.

After the State rested its case, Case made a motion to dismiss. The court overruled the motion to dismiss.

Case chose to testify in his own defense. He testified that he and Burley had been cellmates for "two to three weeks" and that in that time, a relationship had been established in which Burley was "demanding" of Case. Case testified that Burley

had let him know that Burley "was a gang member" and had a certain "ranking in his gang."

While in the Lancaster County jail, Case had been selected to work as a porter with maintenance and cleaning duties. He testified that the position gave him greater access than other inmates to items such as "[c]leaning supplies, foods, [and] laundry" and that this access sometimes prompted other inmates to ask for favors. Case testified that Burley would try to get Case to get him items but that Case would resist because to do so would be a rule violation and he valued his position as a porter. Case testified that his position as a porter required him to work at night until 2 a.m. and that his hours became an issue with Burley because they conflicted with his sleep schedule. Case stated that because of his hours, Burley "felt . . . that [Case] owed him things, and [that Case] needed to . . . give the demanded things that he wanted." Case testified that Burley's demands made him feel "threatened" and "fearful for [his] physical safety." Case testified that one of the ways Burley intimidated him was to talk about how he used to be a boxer and to demonstrate his skills by shadow boxing. Case testified that he had made certain corrections officers, including Jordan Malcolm, aware of his problems with Burley but that he had never filed a formal grievance or complaint because he feared repercussions from Burley. Case testified that Burley was eventually moved to a different cell because of an incident in which Burley made threats to Case.

Case testified that after Burley was moved to a different cell in the same housing unit, Burley continued to make subtle threats and to bully him. Case testified that several days prior to the altercation with Burley, he had seen Burley being physically threatening to another inmate. Case testified that on February 16, 2018, he had been getting the sense that Burley was going to follow through on threats he had been making toward Case. That afternoon, Case was trying to sleep in his cell and heard someone walking by his cell, "trying to

— to get [his] attention or to disrupt or to annoy [his] sleep." Looking out of his cell, he saw Burley walking with another inmate, and, thinking it was Burley trying to get his attention or annoy him, he came out of his cell and "walked over to him, with no demeanor of intent of doing anything, other than just asking." Case asked why Burley was tapping on his door, and Burley "played coy." Case then got the sense that Burley was going to hit him, based on Burley's "look, his body language." Case testified that Burley then initiated physical contact with a motion that Case described as "a jab . . . tuck his shoulder underneath, walk into [Case], step towards [Case]." Case was "startled," and he pushed Burley. This resulted in a series of punches between the two.

Case testified that his actions, including "taking [Burley] to the ground," were because he "had no other choice but to be . . . defenseful [sic] in that manner, without hitting or closed fisting." Case testified that he took his shirt off during the altercation because Burley was using the shirt to pull him down. He also testified that he did not immediately respond to Yost's commands to stop fighting because "the moment was very heated" and he "did not trust Burley in any type of situation." Case testified that "Yost had no control over that situation" and that he thought that because he did not feel safe, he needed "to stand until an officer either puts cuffs on [Burley] or [himself]."

Case testified regarding the recording of the telephone call that had been admitted into evidence and played during the State's case. He testified that he had had several previous conversations with his mother to let her know about the situation that was going on with Burley. He admitted that when she asked, "'Did he attack you or did you go for him,'" he replied, "'I went for him.'" But he testified that this was not a reference to his physically attacking Burley, but "more or less standing up" and "be[ing] forward with my approach with him." Based on his communications with his mother, he believed that she understood it in the same way. And contrary

to Winter's testimony, Case denied having said that he had decided to handle the situation with Burley himself.

Later, on redirect, defense counsel played the surveillance video and asked Case questions about what was depicted. Counsel referred to a point in the video where Burley is seen making motions that counsel described as "shadow boxing." Case testified that he saw those actions from his cell and that it looked to him like "a threat, maybe a pre-warning." Following his testimony, Case rested his defense without presenting further testimony or other evidence.

In rebuttal, the State called Malcolm as a witness. Malcolm testified that he was a correctional officer at the Lancaster County jail and that he had known Case as an inmate during the period from December 2017 through February 2018. Malcolm supervised Case in his work as a porter, and as a result, he likely had more interaction with Case than with other inmates. Malcolm testified that he would sometimes have conversations with Case when no other inmates were around, but he testified that Case had never discussed any problems he was having with Burley and had never confided that Burley was targeting him for assault. Malcolm testified that he had never witnessed Burley bullying Case and that if he had witnessed such behavior or if Case had reported such behavior, he would have documented it in a report according to procedure rather than attempting to handle the situation himself. Malcolm further testified that if Case had reported being threatened by Burley, he could have been placed in protective custody. On cross-examination, Malcolm testified, inter alia, that inmates in protective custody were subject to more restrictions and more time in their cells than other inmates. After the State rested its rebuttal, Case renewed his motion to dismiss and the court overruled the motion.

At the jury instruction conference, the main issue of discussion was Case's proposed instruction on self-defense. Case proposed the following instruction:

Case acted in self-defense if:

1. . . . Burley used or threatened force against . . . Case; and

2. Under the circumstances as they existed at the time, . . . Case reasonably believed that the force he used against . . . Burley was immediately necessary to protect himself against any such force used or threatened by . . . Burley.

The fact that . . . Case [may] have been wrong in estimating the danger does not matter so long as there was reasonable basis for he believed [sic] and he acted reasonably in response to those beliefs.

The State opposed Case's proposed instruction and argued that the evidence showed that Case had unjustifiably placed himself in harm's way. The State noted that Case's own testimony indicated that when he perceived a threat form Burley, "he [left] his cell and immediately [went] to talk with . . . Burley about it. And then, in all less than a minute, this happens." The State argued that Case "could have easily stayed in his cell or he could have easily asked the correctional officer for assistance." The State further argued that the alleged tapping on Case's cell door was "probably annoying" but "not a threat of force" that would "justify him going on the offensive." The State concluded that Case's use of force was not "immediately necessary and justifiable under the circumstances."

Case argued that precedent required the court to give a self-defense instruction where there was any evidence in support of a legally cognizable theory of self-defense. He argued that there was evidence that he had gone into a dayroom, where he had a right to be, with the intention of speaking with Burley and not with the intention of starting a physical fight. He further argued that there was evidence that Burley made a move toward Case, which action gave rise to a claim of self-defense.

The court refused Case's proposed instruction on self-defense. The court stated, "I think the evidence shows that . . .

Case left his cell, went directly to confront . . . Burley, and I think no one's testified that . . . Burley made the initial contact. It was . . . Case that made the initial contact. It was . . . Case that started the confrontation."

After the case was submitted to the jury. The jury returned a verdict finding Case guilty of assault by a confined person. The court accepted the verdict and thereafter sentenced Case to 365 days in jail followed by postrelease supervision for 12 months.

Case appeals his conviction and sentence.

## ASSIGNMENTS OF ERROR

Case claims that the district court erred when it (1) refused his proposed self-defense instruction and (2) admitted the recording of the telephone call. He also claims there was not sufficient evidence to support his conviction.

## STANDARDS OF REVIEW

[1] Whether jury instructions are correct is a question of law, which an appellate court resolves independently of the lower court's decision. *State v. Bigelow*, 303 Neb. 729, 931 N.W.2d 842 (2019).

[2] Trial courts have broad discretion with respect to sanctions involving discovery procedures, and their rulings thereon will not be reversed in the absence of an abuse of discretion. *State v. Hatfield, ante* p. 66, 933 N.W.2d 78 (2019).

[3] Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably

to the State, is sufficient to support the conviction. *State v. Stubbendieck*, 302 Neb. 702, 924 N.W.2d 711 (2019).

## ANALYSIS

*Self-Defense Instruction.*

Case first claims that the district court erred when it refused his proposed self-defense instruction. In *State v. Graham*, 234 Neb. 275, 450 N.W.2d 673 (1990), we stated that only where the jury could reasonably find that the defendant's use of force was justified should the trial court instruct the jury on self-defense. We determine that the evidence did not support a self-defense instruction and that therefore, the court did not commit reversible error when it refused the instruction.

[4] To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Bigelow, supra*. As discussed below, we determine that Case's tendered instruction on self-defense was not warranted by the evidence and that therefore, we need not consider whether the instruction was a correct statement of the law or whether Case was prejudiced by the court's refusal to give the instruction.

[5] We have held that a trial court is required to give a self-defense instruction where there is any evidence in support of a legally cognizable theory of self-defense. *State v. Kinser*, 252 Neb. 600, 567 N.W.2d 287 (1997). Case cites this proposition and emphasizes that because of the "any evidence" language, the court was required to give his proposed self-defense instruction. In support of his argument, Case points to evidence to the effect that Burley had threatened him in the past; that in the days leading up to the incident, the threats had become more immediate; and that before Case threw his first punch, Burley had made a move toward Case that Case characterized as a "jab."

[6] Although the evidence noted by Case could be favorable toward proving a theory of self-defense, the proposition relied on by Case must be read in its entirety. It is not enough to merely show "any evidence" of self-defense to support an instruction thereon. Instead, the defendant must show "any evidence in support of a legally cognizable theory of self-defense." *Id.* at 607, 567 N.W.2d at 292. As we further stated in *Kinser*:

> It is only when the evidence does not support a legally cognizable claim of self-defense or the evidence is so lacking in probative value, so as to constitute a failure of proof, that a trial court may properly refuse to instruct a jury on a defendant's theory of self-defense.

252 Neb. at 606-07, 567 N.W.2d at 292.

Although the evidence noted by Case could be part of a legally cognizable case of self-defense, the court needed to determine without deciding factual issues whether the evidence would support self-defense under Nebraska law. We therefore review aspects of self-defense under Nebraska law that are relevant to assessing the evidence in this case.

[7] Self-defense is a statutorily defined affirmative defense in Nebraska. *State v. Smith*, 284 Neb. 636, 822 N.W.2d 401 (2012). Neb. Rev. Stat. § 28-1409(1) (Reissue 2016) provides in relevant part that "the use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." We have interpreted § 28-1409 to mean that to successfully assert the claim of self-defense, a defendant must have a reasonable and good faith belief in the necessity of using force and the force used in defense must be immediately necessary and justified under the circumstances. *State v. Urbano*, 256 Neb. 194, 589 N.W.2d 144 (1999); *State v. Marshall*, 253 Neb. 676, 573 N.W.2d 406 (1998); *State v. Kinser, supra*; *State v. Graham*, 201 Neb. 659, 271 N.W.2d 456 (1978).

[8] Extrapolating from the requirement that the force used must be "justified under the circumstances," in a case involving a conviction for assault by a confined person, we stated, "If a defendant has unjustifiably placed himself or herself in harm's way, a court may properly find that such facts do not support a lawful claim of self-defense." *State v. Urbano*, 256 Neb. at 201, 589 N.W.2d at 151. In *Marshall*, this court reasoned that the defendant voluntarily put himself in a position of danger by going outside of his home to confront two men when there was no evidence that anything prevented him from remaining safely in his home and thereby avoiding the occasion to use force.

Applying the law set forth above to the evidence in this case, we determine that the evidence did not support a legally cognizable theory of self-defense. In doing so, we apply the law as set forth in *Urbano* and *Marshall*. The district court rejected Case's self-defense instruction because Case "made the initial contact." As the undisputed facts recited earlier in our opinion show, Case left his cell and walked directly up to Burley. The record is clear that there was no evidence that Case was prevented from remaining safely inside his cell. Instead, he unjustifiably placed himself in harm's way, and such facts do not support a legally cognizable theory of self-defense.

Given the foregoing, we determine that the evidence did not support a self-defense instruction, and we conclude that the district court did not err when it refused the instruction proposed by Case.

*Recording of Telephone Call.*

Case next claims that the district court erred when it admitted the recording of the telephone call. Although at trial Case objected to the recording based on both foundation and the alleged discovery violation, his argument on appeal is limited to the discovery violation. We conclude that because Case failed to move for a continuance after the evidence was

provided by the State, Case has waived his right to relief from
the State's belated production of the recording.

[9,10] Discovery in a criminal case is generally controlled
by either a statute or a court rule. *State v. Hatfield, ante* p.
66, 933 N.W.2d 78 (2019). Nebraska's principal discovery
statute, § 29-1912, sets forth a list of evidence that may be
subject to discovery at the discretion of the trial court. The
list includes a defendant's prior criminal record, the names
and addresses of witnesses on whose evidence the charge is
based, and documents, papers, books, accounts, photographs,
objects, or other tangible things of whatsoever kind or nature
which could be used as evidence by the prosecuting authority.
Neb. Rev. Stat. § 29-1919 (Reissue 2016) sets forth various
remedies the court may employ when there is a claimed viola-
tion of a discovery order: The court may (1) order such party
to permit discovery or inspection of materials not previously
disclosed, (2) grant a continuance, (3) prohibit a party from
calling a witness not disclosed or introduce evidence not dis-
closed, or (4) enter another order as it deems just under the
circumstance. We have held that if a continuance would have
been a sufficient remedy for a belated disclosure in violation
of § 29-1912, a defendant who fails to request a continu-
ance waives any rights he or she may have had pursuant to
§ 29-1912. *State v. Hatfield, supra*.

The record shows that immediately prior to the start of trial,
the court considered Case's objection to admission of the tele-
phone recording on the basis that the State had provided the evi-
dence to Case only the day before trial, which was well beyond
the time the State was required to provide evidence pursuant to
the court's discovery order. There was some dispute between
Case and the State as to whether the recording of the telephone
call was evidence subject to discovery under § 29-1912 and
the court's discovery order. However, the State argued that
because it had provided the evidence to Case, even if such late
disclosure violated the discovery order, the proper remedy was
not to exclude the evidence but to allow a continuance if Case

requested one. The court overruled Case's objection, and Case did not thereafter request a continuance.

While a court may order that a party not be permitted to offer evidence at trial which it failed to disclose, this court has stated a preference for a continuance in such situations. *State v. Hatfield, supra*. In the circumstances of this case, a continuance would have been a sufficient remedy if Case needed additional time to prepare a defense to the newly disclosed evidence. However, Case failed to request a continuance after the court overruled his objection, and therefore, he waived any right he may have had pursuant to § 29-1912. See *State v. Hatfield, supra*. We therefore conclude that the district court did not err when it admitted the recording of the telephone call into evidence.

*Sufficient Evidence to Support Conviction.*

Case finally claims that the evidence was not sufficient to support his conviction. We conclude that the evidence was sufficient.

[11] When a criminal defendant challenges the sufficiency of the evidence upon which a conviction is based, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Montoya, ante* p. 96, 933 N.W.2d 558 (2019).

Case was charged with assault by a confined person as a Class IIIA felony in violation of § 28-932(1), which provides in relevant part: "Any person (a) . . . who is legally confined in a jail or an adult correctional or penal institution . . . and (b) who intentionally, knowingly, or recklessly causes bodily injury to another person shall be guilty of a Class IIIA felony . . . ." Case does not dispute that the evidence established that at the time of the altercation with Burley, he was legally confined in the Lancaster County jail. Instead, he argues that the evidence was not sufficient to establish that he intentionally, knowingly,

or recklessly caused bodily injury to Burley. Much of his argument in this regard is based on his theory that he acted in self-defense. However, as discussed above, the evidence did not support a legally cognizable theory of self-defense, and therefore, such argument does not establish that the evidence was not sufficient to support Case's conviction.

There was sufficient evidence, including the video recordings, testimony by witnesses including Burley, and Case's statement in the recording of the telephone call that he "went for" Burley, as well as his own testimony, to support a finding that Case physically assaulted Burley. There was also evidence that Burley suffered bodily injury and that such injury had been caused by Case's physical assault. Case argues that Burley's testimony in particular is not credible; however, we do not pass on the credibility of witnesses on appeal, *State v. Stubbendieck*, 302 Neb. 702, 924 N.W.2d 711 (2019), and Burley's testimony, if believed, as well as other evidence supports the conviction. Case directs us to his testimony that his intent when he approached Burley was not to assault him but merely to talk to him. Case asserts that this testimony establishes that he did not intentionally, knowingly, or recklessly cause bodily injury to Burley. Again, we do not review the jury's credibility assessments of Case's testimony regarding his intent. We conclude that there was sufficient evidence to support Case's conviction.

## CONCLUSION

We conclude that the district court did not err when it refused Case's proposed self-defense instruction; nor did it err when it allowed the recording of the telephone call into evidence. We further conclude that there was sufficient evidence to support Case's conviction. We therefore affirm Case's conviction and sentence.

Affirmed.