IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. SMITH

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

LEROY SMITH, APPELLANT.

Filed April 21, 2020.    No. A-19-517.

Appeal from the District Court for Lancaster County: SUSAN I. STRONG, Judge. Affirmed.

Mark E. Rappl for appellant.

Douglas J. Peterson, Attorney General, and Matthew Lewis for appellee.

MOORE, Chief Judge, and RIEDMANN and WELCH, Judges.

MOORE, Chief Judge.

## INTRODUCTION

Leroy Smith appeals from his conviction in the district court for Lancaster County following a jury trial for second degree assault. The court imposed a sentence of 10 to 14 years in prison. On appeal, Smith asserts the court should have instructed the jury on self-defense. Finding no error, we affirm.

## BACKGROUND

On October 5, 2018, the State filed an information in the district court, charging Smith with strangulation in violation of Neb. Rev. Stat. § 28-310.01(2) (Reissue 2016), a Class IIIA felony; second degree assault in violation of Neb. Rev. Stat. § 28-309 (Reissue 2016), a Class IIA felony; and use of a deadly weapon to commit a felony in violation of Neb. Rev. Stat. § 28-1205(1)(b) (Reissue 2016), a Class II felony. The charges resulted from Smith's interactions with Darryl Corner on August 19, 2018, and the resulting altercation.

A jury trial was held on March 11-14, 2019. The State presented testimony from Corner, multiple witnesses who observed various portions of the altercation between Smith and Corner, and two police officers who investigated the charges. The State offered various exhibits, which were received by the district court, including photographs of the scene and Smith's vehicle, Corner's and Smith's alleged injuries, and the stick or rod used by Smith during the altercation.

The State's first witness was Elizabeth Causey, who had an "off and on over the years" relationship with Smith. They were not dating on August 19, 2018, but according to Causey, they still socialized and were considering getting back together, although Causey indicated that Smith had called her multiple times the previous night threatening to kill her the next day.

At the time of the incident at issue, Causey lived in one-half of a duplex in Lincoln, Nebraska. The other half of the duplex was occupied at that time by Causey's son and his son, Causey's granddaughter (Nikaiyah Patterson, who was then 8 months pregnant), and Corner (who was Patterson's fiance). Causey's adult daughter, Corrina Mitchell, lived in the side occupied by Causey's son (Mitchell's brother), but had spent the night prior to the events at issue here in Causey's side of the duplex. The units in the duplex have separate front doors, but they share a back door. During Causey's testimony, the district court received various exhibits showing the front and back of the duplex, the street in front of the duplex, and the alley running along the side of the duplex from various angles.

Causey testified that on August 19, 2018, she was asleep when Smith began "beating on [Causey's front] door, real loud" a little before 9 a.m. Mitchell came into the bedroom and told her that Smith was demanding repayment of $20 he had loaned Causey. Causey gave Mitchell the money, and Mitchell "cracked" open the front door to hand the money to Smith. After receiving the money, Smith continued to beat on the door, wanting to come in and speak with Causey. According to Causey, when she declined, Smith went around the outside of the duplex and hit and knocked out her bedroom window. Causey identified photographs, which were received into evidence, depicting the window broken by Smith.

After Smith broke her bedroom window, Causey went to her son's side of the duplex to speak to her son and Corner about what had happened. Causey testified that her son and Corner then went outside to talk to Smith, and she went to a neighbor's residence behind the duplex because she "heard a lot of noise, screaming" and wanted to see if anybody at the neighbor's residence could "stop them from fighting." Causey located an individual called "Pig," and she thought he "ran over" to the fight though she was not certain. Causey left her neighbor's house and went to a nearby relative's residence to call the police and hide from Smith. Causey indicated that she did not return to the duplex until after the police had arrived and did not observe the physical altercation between Smith and Corner. Causey stated that during the incident, she never threatened Smith, with a hammer or otherwise, and did not direct anyone to assault or attack Smith. On cross-examination, she confirmed that she never grabbed a hammer to defend herself.

Mitchell's description of her interaction with Smith on the morning in question was consistent with Causey's testimony. Mitchell testified that she woke up that morning to "loud beating on the door." When she answered the door, she saw Smith, who said, "Tell your mom to bring me my mother fuckin' money." Mitchell confirmed that Smith did not leave after she gave him the money, indicating that he continued to use profanity and demand to see Causey. She

described his demeanor as "very aggressive, like he was very, very frustrated." After Mitchell had closed the front door, she heard "[a] loud glass shatter" and Smith saying "[i]t's going to happen today. I'm not scared of nobody. I'm not worried about none of this shit." According to Mitchell, Smith continued to yell from outside the duplex, "I'm not scared of nobody . . . [y]'all will have to kill me today . . . I'm not worried about nobody doing nothing to me."

Mitchell testified that she went with Causey to the nearby relative's residence but returned to the front yard of the duplex when "the altercation started." When she got there, Mitchell saw her brother, Corner, and Smith in the yard. Mitchell observed Smith "on top of" Corner "choking him." Mitchell explained that Smith "had like a stick thing, had it on [Corner's] neck, choking him with it." She identified the wooden rod shown in a photographic exhibit as the object Smith used to choke Corner and demonstrated how Smith had used the object on Corner. Mitchell described Corner as "[j]ust struggling, trying to get [Smith] off him." After Corner succeeded in doing so, Smith got in his car. At some point, Patterson came outside, and Mitchell indicated that she tried to comfort Patterson, who was crying, holding her stomach, and on the phone trying to contact the police. Mitchell confirmed that Causey was not present during the altercation.

Mitchell described Corner's position and Smith's actions after he returned to his car. According to Mitchell, Corner was standing in the alley next to the duplex when Smith backed his car "halfway out of the driveway" before putting it in drive and heading "straight towards the alley" toward Corner at a "very fast" speed. She stated that Corner "kind of jumped a little bit over [Smith's] car" but that he was hit by the car and landed on the ground in the alley. Mitchell testified that Smith proceeded down the alley without slowing or stopping to check on Corner, who she recalled as being "in a lot of pain" after being hit by Smith's car.

Mitchell stated that she never saw Corner strike Smith during the altercation. She denied that there was anyone standing next to Smith and Corner during their altercation and denied that there was anybody threatening Smith either during the altercation or when he got into his car. But, she agreed that she did not know who might have been outside observing the altercation prior to her arrival. Mitchell did not recall seeing "Pig" out there. She indicated that there was traffic in the street behind Smith's car when he backed up before driving down the alley. She denied hearing anything like a loud explosion or gunshot after Smith got in his car. Mitchell also denied having a knife or seeing anyone else outside with a knife, hammer, or other weapon during the altercation.

Corner testified about his interaction with Causey on the morning of August 19, 2018, and the subsequent altercation with Smith. Corner stated that when Causey came over to the side of the duplex where he was living, she told him and Causey's son that Smith was outside, "breaking windows and going crazy." Corner followed Causey back to her side of the duplex, went out Causey's front door, and saw Smith walking through the alley and getting into his car. As Smith was backing out of the driveway, Corner asked him "why was he going crazy like that, what's going on, like what's the problem." Smith responded by pulling back into the driveway to the spot where he had previously parked. Smith got out of the car again, and Corner made further inquiries about why Smith had broken the window. According to Corner, he wanted to find out what was going on and was also concerned because of stress-related complications Patterson was experiencing during her pregnancy. He indicated that Smith told him that "we needed to tell her to give him his money, and that she needed to stop playing with his money." Corner and Smith then

moved closer to each other and "exchanged words" about "the money situation." According to Corner, Smith's demeanor at this point was "[a]ngry" and Smith was using a "[h]igh pitched" tone of voice." Corner recalled Smith grabbing him with two hands, after which Corner hit Smith in the face. Corner elaborated that Smith "grabbed my chest, my shirt over my chest." They exchanged profanities and "started to tussle," grabbing and punching each other.

The altercation proceeded until Corner fell to the ground due to wet weather conditions; Smith also fell to the ground. After Smith stood up, he went to his car and "grabbed a stick" from it. Corner identified a photograph of a stick or rod subsequently found in Smith's car by law enforcement as the item Smith had grabbed. After retrieving the stick, Smith approached Corner while swinging the stick with his hand. Corner fell to the ground again due to the wet conditions, and Smith "fell on top of [Corner] with . . . the stick, in [Corner's] neck, pressing down." Corner denied that Smith's fall was accidental, testifying that it appeared to be an intentional act by Smith. Corner testified that the pressure of the stick on his neck made him feel like he was "fading out" and that the pressure was enough to cause him to have difficulty maintaining consciousness, although he never completely lost consciousness. Corner recalled having one hand on Smith's throat and punching Smith with the other as he tried to remove Smith from on top of him. Eventually, Corner used his legs to kick Smith off of him. Corner then moved toward the garage next to the alley, and Smith returned to his car.

Smith initially backed his car down the driveway, and Corner moved into the alley next to the duplex. According to Corner, Smith then "floored it, right back towards me," by which he meant that Smith was "[c]oming straight at me, full speed." Corner stated that he "froze" to see "in which direction the car was going to come towards [him]," so he could "jump the opposite way." Corner ended up jumping into the air when the car was close to him because he thought he would be pinned between Smith's car and the garage or run over. Smith did strike Corner with the car, causing Corner to roll off the windshield on the passenger side and land partly on the driveway concrete. Corner felt pain and numbness in his legs and shoulder after being hit, and he subsequently was taken to the hospital. He identified photographs that were received into evidence depicting his injuries. Corner did not remember seeing "Pig" until after the police arrived on the scene, and he denied hearing any gunshots or similar loud noises or seeing anyone approach, threaten, or be aggressive toward Smith during the altercation.

On cross-examination, Corner denied seeing Causey outside with a hammer in her hand that morning, but he agreed that he did see her with a hammer inside of the duplex. He testified that when he went outside that morning, it looked like Smith was about to leave in his car. When asked if his intention in going outside was to make sure Smith left, Corner stated that he wanted to see what was going on but that he was not trying to force Smith to leave. Corner stated that he and Smith did not exchange any vulgarities until Smith parked and got back out of his car. Specifically, Corner indicated that when Smith made certain comments about money, Corner responded, "You need to stop acting like a bitch," which resulted in Smith grabbing Corner with both hands. Corner denied pushing or hitting Smith until after Smith grabbed him, although he acknowledged that in a statement to law enforcement he indicated that he and Smith were pushing each other after Smith initially exited his car.

On redirect, Corner confirmed that he made no physical attempts or threatening gestures to stop Smith from leaving at any point, and he denied having a weapon. Corner affirmed that Smith "made the first move" of the altercation by grabbing Corner and that Smith purposely "fell on" him with the rod.

Patterson testified about her recollections of that morning's events. With respect to the fight itself, Patterson recalled seeing Corner on the ground with Smith on top of him. Patterson confirmed that Smith had the wooden rod shown in one of the photographs "to [Corner's] neck" and testified that she was "hollering, telling [Smith] to get off [Corner] and for them to stop and break it up." Patterson estimated that she was standing a "couple feet away" from the fight but denied going up to and touching either Smith or Corner. She also denied having a weapon or threatening Smith in any way. While the fight was in progress, Patterson went inside to retrieve her cell phone so she could call 911, and she apparently stepped back outside to report what she was seeing. Patterson testified that Causey's son and Mitchell were outside at that point and that Smith was still there. Apparently Patterson went back inside at some point because she testified that she did not see Smith's car hit Corner, indicating that she ran outside when she heard car tires "screeching." When Patterson ran outside, she saw Corner lying on the ground.

During cross-examination, Patterson was questioned about prior deposition testimony, and she agreed that she had previously testified about Corner's demeanor as he exited the duplex that morning by stating that he was "bold or confident," that he was "tired and that it was too early in the morning for . . . Smith to be over there with all of the conflict," and that Corner "just wanted to get . . . Smith to leave." Patterson again asserted that she did not remember getting close enough to push Smith during his altercation with Corner, but she acknowledged that in prior deposition testimony she had stated, "I think I tried to push [Smith], but I couldn't." Patterson was questioned further about who was outside during the fight, affirming that Causey's son and Mitchell were there but indicating "Pig" did not arrive until after Smith struck Corner with his car. She again stated that she never had a weapon in her hand while she was outside and testified that she did not recall seeing any one else with any weapons.

The final witness who testified about his observations of the altercation was Austin Wubbels, who was staying with a friend in the residence next door to the duplex. Wubbels woke up that morning to yelling and what sounded like someone beating on the side of a house. When he looked out of a window facing the duplex, Wubbels saw a man with a stick, and he identified a photograph of the rod police found in Smith's car as being "just like" the item he saw. Wubbels testified that the man was "smacking on the side of the house and yelling" and that he hit and broke a window in the duplex. Wubbels identified Smith as the man he saw breaking the window that morning.

Next, Wubbels saw Corner come outside onto the duplex's front porch. According to Wubbels, Smith approached Corner "with the stick or club . . . and was yelling . . . obscenities at him, and was swinging the club at him." He indicated that while Smith approached Corner with the stick, Corner left the porch and began backing down the driveway. Wubbels stated that Corner had his hands up in the air while backing up and that when Smith and Corner reached the street, Smith "took [Corner] to the ground in the street," by which he meant that Smith "tackled him to

the ground." Wubbels moved to a different window to get a better view, and his description of the next portion of the altercation was consistent with that of other witnesses.

Wubbels then observed Smith get into his car and back up "a little ways," testifying that Smith then "put the car in drive and accelerated through the driveway, alley . . . striking . . . Corner on . . . his way out." Wubbels described Smith's exit as "a very fast acceleration" with tires spinning. Wubbels recalled Corner jumping "straight up" and saw him being struck by the passenger side headlight, before he "tumbled up the hood of the car," rolled off, and landed on the ground." Wubbels testified that Smith "kept speeding off" without slowing or stopping. Wubbels did not see anyone approach or threaten Smith before he got into his vehicle and did not recall hearing any explosions or the sounds of a gun when Smith accelerated his car.

On cross-examination, Wubbels testified that he saw a woman outside with a kitchen knife during the altercation. He did not see a woman with a hammer during the incident, but he testified that he was aware of the hammer afterwards because he heard a police officer telling her to bring it back inside. On redirect examination, Wubbels described the women who were outside during the incident as yelling but not making any physical threats toward Smith. He did not recall the women being any closer than 10 feet or approaching Smith during the altercation.

Sergeant Jason Wesch of the Lincoln Police Department was on duty on August 19, 2018, and responded to the incident at the duplex. He took photographs documenting the surroundings after police received information from witnesses at the scene that a vehicle had struck someone and then fled down the alley next to the duplex. Wesch also had contact with Smith on August 19 at another address in Lincoln and received Smith's consent to search his car. Wesch did not search the car himself but had the opportunity to observe the car that morning, and he identified certain photographs of the car received into evidence as accurately depicting the car. Wesch also identified another photograph received by the district court, depicting a hammer on an end table inside Causey's side of the duplex, which he took because another officer told him that Causey "had picked up a hammer to arm herself, at one point." Wesch testified that he took the picture because he felt it was relevant based on the information he had been given and because he "at least wanted to document where the hammer was at the time" he observed it. Wesch never verified with Causey whether she had touched the hammer that day.

Officer Robert Brenner of the Lincoln Police Department also responded to the duplex after hearing a dispatch report of a fight. When Brenner arrived, several other police officers were already there. He also saw several other people outside, and he specifically recalled seeing two men, one with apparent injuries to his face, and a pregnant woman. Brenner testified that "[p]eople appeared to be crying, upset." Brenner did not stay to investigate because he was dispatched to another scene, but while in transit, he heard radio reports with a description of the "suspect vehicle" from the incident at the duplex and its possible location. Because he was in the vicinity, Brenner began looking for the vehicle, and he located it parked outside of the address where Smith was located. After being informed that Smith had given his consent, Brenner searched the car and located a wooden rod depicted in photographs received into evidence. Brenner also testified about photographs depicting damage to the front windshield on the passenger side of the car. Brenner took a photograph of Smith, because Smith complained of pain in his left ear and claimed he was

struck there. Brenner testified, however, that he saw no such injuries, and there are not any clearly discernable injuries depicted in the photograph of Smith received into evidence.

Prior to closing arguments, the district court held a jury instruction conference on the self-defense jury instruction requested by Smith. Citing *State v. Kinser*, 252 Neb. 600, 567 N.W.2d 287 (1997), Smith's attorney argued that there was at least a reasonable basis for the jury to conclude that there was potentially unlawful force being exercised upon Smith to warrant the instruction. He argued that Corner's actions during the altercation together with the presence of other individuals, including a person with a knife, "surrounding them during the altercation" and outnumbering Smith justified giving a self-defense instruction. The court declined to give the requested instruction, citing a lack of evidence that Smith was acting in self-defense. In doing so, the court stated, "I think the evidence in this case is extremely thin on self defense" and that "it would be pure speculation on the part of the jury that [Smith] was possibly acting in self defense. . . . I don't think that's enough to give that instruction."

The jury found Smith guilty of second degree assault, but it found him not guilty of strangulation and of use of a deadly weapon to commit a felony. The court subsequently sentenced Smith to incarceration for a period of 10 to 14 years.

## ASSIGNMENT OF ERROR

Smith asserts that the district court erred in denying his request to have the jury instructed as to self-defense.

## STANDARD OF REVIEW

Whether jury instructions are correct is a question of law, which an appellate court resolves independently of the lower court's decision. *State v. Case*, 304 Neb. 829, 937 N.W.2d 216 (2020).

## ANALYSIS

Smith asserts that the district court erred in denying his request to have the jury instructed as to self-defense.

To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *Id.*

To successfully assert the claim of self-defense, a defendant must have a reasonable and good faith belief in the necessity of using force and the force used in defense must be immediately necessary and justified under the circumstances. *Id.* See, also, Neb. Rev. Stat. § 28-1409 (Reissue 2016) (concerning use of force in self-protection). If a defendant has unjustifiably placed himself or herself in harm's way, a court may properly find that such facts do not support a lawful claim of self-defense. *State v. Case, supra*.

A trial court is required to give a self-defense instruction where there is any evidence in support of a legally cognizable theory of self-defense. *Id.* It is only when the evidence does not support a legally cognizable claim of self-defense or the evidence is so lacking in probative value,

so as to constitute a failure of proof, that a trial court may properly refuse to instruct a jury on a defendant's theory of self-defense. *Id.*

Smith argues that because the district court noted the existence of some evidence of self-defense, the court was required to give the instruction. Smith relies on *State v. Kinser*, 252 Neb. 600, 567 N.W.2d 287 (1997). In that case, the defendant was convicted of first degree assault, second degree assault, and use of a weapon in the commission of a felony, after striking someone in a bar with a drinking glass. The trial court refused to give a self-defense instruction, and on appeal, this court reversed and remanded for a new trial. After the State sought further review, the Nebraska Supreme Court affirmed this court's judgment. In *Kinser*, a witness testified at trial that the victim had made "'an aggressive, provocative move'" upward toward the defendant's throat with a beer bottle that he was holding. 252 Neb. at 603, 567 N.W.2d at 290. In contrast, the victim testified that the assault was unprovoked, occurring while the victim's back was turned to the defendant. The Supreme Court stated that the nature of an affirmative defense is such that the defendant has the initial burden of going forward with evidence of the defense. *State v. Kinser, supra*. When the defendant has produced sufficient evidence to raise the defense, the issue is then one which the State must disprove. *Id.* The court noted that a defendant only needs to adduce a slight amount of evidence to satisfy the initial burden of raising the issue of self-defense, but it also observed that "as a practical matter, a slight amount of evidence may not be enough to ultimately prevail on the defense of self-defense." *Id.* at 607, 567 N.W.2d at 292. The court concluded that because the eyewitness testimony would have supported the defendant's theory of self-defense, the defendant satisfied his burden of introducing evidence supporting a self-defense claim. The court concluded that the effect of the trial court's refusal to give a self-defense instruction was to withdraw from the jury's consideration the essential issue of the State's burden to prove that the defendant did not act in self-defense.

Here, the State argues that this case is more comparable to *State v. Marshall*, 253 Neb. 676, 573 N.W.2d 406 (1998). In *Marshall*, the Nebraska Supreme Court determined that the trial court properly refused to give a jury instruction on self-defense where the evidence showed that the defendant voluntarily placed himself in danger when he went outside his residence to confront individuals he felt intended to harm him due to a prior exchange of words. At trial, the defendant testified that he saw a gun in one of the individual's hands, so he pulled a gun out of his pocket and began shooting at them. The defendant, who was convicted of second degree murder, argued on appeal that the trial court erred by failing to instruct the jury on self-defense. The Supreme Court disagreed because there was no evidence that there was anything preventing the defendant from remaining safely in his residence, avoiding any need to use force on his part. Because the court found no evidence to support a legally cognizable theory of self-defense, it concluded that the trial court did not err in refusing the defendant's requested jury instruction.

In this case, the trial evidence did not support a claim of self-defense. While the evidence shows that Corner did use some profanity when he came out of the duplex and that he struck Smith during their altercation, the evidence shows that Smith was angry and aggressive when he first came to the duplex, yelling profanity, and breaking Causey's bedroom window. Smith went to or got in his car three different times (i.e., he had three opportunities to leave the scene safely) and when he finally left the scene, he drove his car at a high speed directly toward where Corner was

standing in the alley, striking and injuring Corner in the process. Although there were other people outside during the altercation, one or more of which may have had a hammer or a knife, there was no evidence that any of them actually threatened Smith with those objects or that the situation was such that Smith had to defend himself or could not have safely left the premises. Likewise, there is no evidence to suggest that Smith could not have waited for traffic to clear on the street, or driven more slowly down the alley, and maneuvered his car to avoid striking Smith. In short, the evidence does not support an inference that Smith had a reasonable and good faith belief in the necessity of using force to defend himself against Corner by striking Corner with his car.

The district court found that the evidence of self-defense was lacking, was "extremely thin," and that giving the instruction would require the jury to engage in speculation. We agree. Because the evidence did not support a claim of self-defense in this case, the district court did not err in refusing to give the requested instruction.

## CONCLUSION

The district court did not err in refusing to give the requested self-defense jury instruction.

AFFIRMED.