IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STATE V. CODY


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


STATE OF NEBRASKA, APPELLEE,

V.

GREGORY S. CODY, APPELLANT.


Filed January 12, 2021.    No. A-19-852.


Appeal from the District Court for Lancaster County: KEVIN R. MCMANAMAN, Judge. Affirmed.

Jason E. Troia, of Dornan, Troia, Howard, Breitkreutz & Conway, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.


BISHOP, ARTERBURN, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Gregory S. Cody appeals his conviction for first degree sexual assault and his sentence of 12 to 16 years' imprisonment. On appeal, he assigns numerous errors governing the admissibility of evidence, jury instruction errors, insufficiency of the evidence to support his conviction, that the sentence imposed was excessive, and that his trial counsel was ineffective in various ways. For the reasons set forth herein, we affirm.

## II. STATEMENT OF FACTS

### 1. BACKGROUND FACTS

In July 2016 around 2 a.m., Lincoln Police Officer Cody along with other Lincoln Police Officers responded to a call that A.H., who was missing and potentially suicidal, was at Holmes

- 1 -

Lake sitting on the top of a 16-foot-tall baseball field backstop. Although officers encouraged A.H. to come down from the backstop, she refused to do so until she was told that she would not be placed in emergency protective custody (EPC). As A.H. attempted to climb down the backstop, her pants became caught prompting Cody to climb up a ladder to free her. Once on the ground, A.H. was handcuffed and advised that she needed to receive an evaluation. A.H. became upset, claiming she had been lied to, then attempted to escape but was apprehended. A.H. resisted an officer's attempt to seat her in a cruiser, so the officer placed her in a wristlock to gain her compliance. After A.H. complained about pain in her wrist, Cody transported her to the hospital for an examination but did not place her in EPC.

Within a month after these events, Cody sent A.H. a Facebook friend request, which she accepted. Cody and A.H. initially communicated via Facebook Messenger but later began meeting in person. During those meetings, A.H. would share her problems with Cody and he would tell her things like she was too pretty to cut up her arms. Eventually A.H. and Cody exchanged phone numbers. Sometimes they called or sent text messages to each other, but Cody, who was married, preferred using Facebook Messenger because it was easier to hide from his wife. Although the evidence was undisputed that Cody communicated with A.H. on Facebook, none of those communications were recovered; however, Cody's cell phone records established that A.H. and Cody continued to have contact with each other over the next year from November 2016 to October 2017.

On October 16, 2017, after A.H. had been drinking, she went to Holmes Lake Park and climbed onto the same backstop where she first met Cody. However, when A.H. attempted to get down, she put one leg over the backstop and apparently fell. When officers arrived at 1:27 a.m., they discovered an unconscious A.H. lying on the sidewalk. Although A.H. eventually regained consciousness, she was lethargic, slow to respond, and had slurred speech. A.H. was transported by ambulance to the hospital where she was admitted to the intensive care unit (ICU). Cody arrived at the hospital that evening and spoke with A.H. As Cody was leaving the hospital, he advised the nurses that A.H. was a "wild one" and stated that they may need to give her a horse tranquilizer.

Shortly after Cody left the hospital, A.H. began experiencing a panic attack. A nurse asked A.H. if Cody had hurt her and A.H. replied "yes." The nurse further inquired if Cody had hurt her sexually, and A.H. again said "yes." Another nurse then performed an initial assessment of A.H. during which A.H. disclosed that Cody had sexually assaulted her for more than a year with the most recent assault occurring at the zoo on October 15, 2017. A.H. also explained that she had not reported the assaults because she did not think anyone would believe her.

After A.H.'s disclosures, the Nebraska State Patrol (NSP) was contacted to investigate her allegations. Investigator Neal Trantham arrived at the hospital to speak with A.H. who he described as sad, withdrawn, and, at times, avoided eye contact. Although initially reluctant, A.H. eventually disclosed the details of her encounters with Cody. As part of his investigation, Trantham took A.H.'s cell phone and photographed her injuries, which included bruising around her left eye and on her right wrist and hand. A.H. claimed she received those injuries during her last encounter with Cody. After Trantham finished talking with A.H. and left the hospital, A.H. became anxious, tearful, and started looking at the clock, expressing concern for her safety, and twice attempted to leave the hospital. A state trooper eventually transported her home.

On October 18, 2017, Trantham, Investigator Stacie Lundgren, and Sergeant Bryan Jones took additional photographs of A.H.'s injuries, which included a mark on A.H.'s neck and an abrasion on her stomach. A.H. was again interviewed and participated in two controlled phone calls to Cody, recorded by law enforcement, during which A.H. confronted Cody about the allegations. However, the recording equipment did not function properly during the first phone call and only recorded A.H.'s statements, not Cody's responses.

During the first phone call, A.H. questioned Cody about his aggressive behavior during two incidents at the zoo. Trantham, who was present during the first phone call, heard Cody acknowledge an incident involving some unwanted contact between himself and A.H. and Cody stated that if that conduct was revealed, he would lose his job. During the second call, which occurred later that same evening, A.H. revisited the first incident at the zoo and said that she wanted to understand why Cody "didn't stop when [she] said to stop." Cody stated that he was "not making excuses" but then blamed his medication. After explaining how the medication affected him, Cody told A.H., "You are absolutely 100 percent right. You said 'stop.' Whatever I was doing, I should've stopped. I -- and again, you have a better recollection than I do. I just -- I fucked up, okay?" A.H. then asked about the second incident where Cody grabbed her and would not let go. Cody stated that he "completely misread the situation." A.H. then asked Cody, "Do you consider what you did that one night rape because I don't know why -- I feel like you were out of control." Cody did not answer but instead offered to meet with A.H. to discuss it. He also stated that he was "super happy" to see her on Sunday night but "obviously messed things up again," asked A.H. to forgive him, and stated that he would like an opportunity to redeem himself. When A.H. asked Cody whether he thought the things he had done "crossed a line," Cody asked, "What do you want from me, [A.H.]?" He again apologized and stated that he would like to remain friends. When A.H. asked "Has it just been about sex," Cody said no and explained that "it was about trying to make [her] feel better about [herself]." When A.H. then asked Cody why he always told her that she needed to be a good girl for him when he was trying to do sexual things to her, Cody said, "Okay, well." He then told A.H. that he had to go on a call but could meet with her later. A.H. asked Cody if he was going to call her later, and he said, "Well, are you going to continue to go around on this or are you going to be better with me?" When A.H. asked Cody what he meant, he said, "I mean, in the sense that are you going to continue to be upset with me." He again apologized and stated that he "fucked up" and "wasn't trying to hurt [her]." A.H. then asked Cody, "Do you want to have sex tonight?" When Cody implied that he was unavailable because he was working, A.H. said, "That's never stopped you before." Cody was silent for several seconds and then said, "Well, I gotta go to this call, so." A.H. told Cody to call her later, and he agreed. Cody then called A.H. three times between 5:45 and 6 p.m., but she did not answer because the investigators told her not to. After the second call, the investigators gathered some additional information from A.H. They also arranged for A.H. to stay in a hotel because she was concerned about her safety.

Later that same night, at approximately 8 p.m., Trantham, Jones, and Sergeant Townsend went to the Lincoln Police Department (LPD) to speak to Cody. After advising Cody that they were investigating a complaint, he stated, "Gee, I wonder from who. Do you know [A.H.]?" They asked Cody if he was willing to speak to them, and he replied, "Not without my attorney." When the troopers advised Cody that they knew about the phone calls with A.H. and just wanted

to get his side of the story, Cody stated that he "knew something was up" and had spoken to an attorney because he "knew this might be coming." Cody then called his attorney, who advised him not to make a statement. Thereafter, Trantham seized Cody's cell phone. At that point, Cody stated, "This is serious. This is much different than excessive force" and mentioned that he had gone to visit A.H. at the hospital yesterday. Cody then stated "no good deed will ever go unpunished." Cody also stated, "I don't know what you guys assumed happened" but "I know what she told you happened." Cody's police cruiser was processed for evidence but no physical evidence was found to corroborate a sexual assault.

Later that night, when LPD Captains Ryan Dale and Donald Scheinost went to Cody's residence to check on him, Cody stated that "nothing happened" other than that he had been talking to a woman for several months, which would be hard on his wife. He also stated, "This is what happens when you try to help someone" and suggested that he should probably resign and "[get] it over with." Two days later, on October 20, 2017, Cody retired.

In January 2018, an information was filed, as amended, alleging that between July 20, 2016, and October 16, 2017, Cody subjected A.H. to sexual penetration without A.H.'s consent. The information further alleged that the offense constituted a registerable offense which classified it as an aggravated offense.

## 2. PRETRIAL MOTION

The pretrial motion relevant to this appeal is Cody's motion entitled Motion and Notice of Intent to Present § 27-412 Evidence. In that motion, Cody indicated he was providing statutory notice of his intent to offer evidence at trial involving A.H. and patterns of behavior. Specifically, the motion stated that Cody intended to offer the following:

1. Evidence of the alleged victim's pattern of behavior regarding false accusations of sexual assault including, but not limited to, the following:

a) Incident in March 2002 wherein the alleged victim reports being sexually assaulted by one, possibly two unknown males at a hotel after smoking marijuana laced with methamphetamine;

b.) Incident in May 2006 wherein the alleged victim reports being sexually assaulted by [a former classmate] after consuming alcohol, Ativan, cocaine, and marijuana;

c.) Incident in March 2015 wherein the alleged victim, while being medically treated for an overdose of Clonazepam, reports being sexually assaulted by her husband, [name omitted], throughout the course of their marriage;

d.) Incident in March 2015 wherein the alleged victim reports being sexually assaulted by her father-in-law, [name omitted], after consuming an excessive amount of Klonopin;

e.) Incident in the fall of 2015 wherein the alleged victim reports she was sexually assaulted by former Lincoln Police Officer [Jared G.] at Holmes Lake Park;

f.) Incident in April 2016 wherein the alleged victim reports she was intoxicated and sexually assaulted by former Lincoln Police Officer [Joseph K.] during a trip to the Hard Rock Cafe Hotel;

- 4 -

g.) Incident in June 2016 wherein the alleged victim, while being medically treated for chest pain, reports being sexually assaulted by her boyfriend at the time, [name omitted]; and

h.) Incident in July 2018 wherein the alleged victim reports being sexually assaulted by a co-worker, whom she refused to name.

2. Evidence that the alleged victim has engaged in "phone sex" or "sexting."

3. Evidence that the alleged victim has engaged in consensual romantic and/or sexual relationships with others.

4. Evidence that the alleged victim has a dating "type" or "likes men in uniform."

5. Evidence regarding the alleged victim's romantic and/or sexual relationship with former Lincoln Police Department officer, [Joseph K.].

6. Evidence regarding the alleged victim's romantic and/or sexual relationship with former Lincoln Police Department officer, [Jared G.].

7. Evidence that the alleged victim received money or gifts from romantic partners, love interests, boyfriends, her ex-husband, and/or sexual partners.

Exclusion of such evidence would violate [Cody's] right to confront and cross-examine his accuser, as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Art. 1, §11 of the Nebraska Constitution. See *Olden v. Kentucky*, 488 U.S. 227, 109 S.Ct.480, 102 L.Ed.2d 513 (1988); *State v. Lessley*, 257 Neb. 903, 601 N.W.2d 521 (1999).

Following a hearing governing Cody's motion and a companion motion in limine filed by the State, the district court entered an order finding Cody "failed to meet his burden of proof under [*State v.*] *Swindle*[, 300 Neb. 734, 915 N.W.2d 795 (2018),] and evidence of A.H.'s prior allegations of sexual assault is inadmissible under Nebraska's rape shield statute."

In furtherance of that conclusion, the district court then discussed each alleged prior false allegation and described why the allegation did not meet the threshold requirements for admissibility under *Swindle*. Regarding A.H.'s allegations of sexual assault against unknown males and [a former classmate], the court concluded:

LPD records indicate that these two cases were listed as inactive because law enforcement was unable to identify the assaulters and lacked corroborating evidence. There is no evidence that A.H. has recanted or lied regarding these allegations. In fact, the evidence indicates that a registered nurse performed a vaginal exam on A.H. and identified "a small vaginal tear in the vaginal area." . . . Moreover, [a former classmate] admitted to having sexual intercourse with A.H., and therefore, this evidence falls within the scope of the rape shield statute.

Concerning A.H.'s accusation of sexual assault by her ex-husband, the court found that the ex-husband "admitted that there was at least one incident when A.H. said 'no' and he did not stop." Thus, there was no evidence that these accusations were false.

With respect to A.H.'s allegation of sexual assault by her ex-boyfriend, the court found that A.H.'s ex-boyfriend "admitted that he had sex with A.H. and that he could see how, from A.H.'s perspective, she might have been unable to consent due to her prescription drug use.

There is no evidence that A.H. has recanted or lied regarding her allegation against her ex-boyfriend."

Reviewing the incidents regarding A.H.'s ex-boyfriend and an unnamed coworker, the court determined Cody failed to meet his burden of proof. The court explained that A.H. made a sexual assault accusation against her ex-boyfriend but informed the officer that she did not want it reported. She never recanted her allegation against her ex-boyfriend. As for the unnamed coworker, A.H. reported she had been sexually assaulted by her coworker but refused to elaborate on the details. A.H. never recanted this allegation. Additionally, concerning the two LPD officers, Jared G. and Joseph K., the court found no sexual assault report was made against either officer; thus, Cody failed to meet his burden that a sexual assault allegation was falsely made.

Regarding Cody's Sixth Amendment claim, the court explained "[a]bsent a showing that no other possible impeachment method exists, a defendant's inability to use a complaining witness' prior sexual acts for impeachment purposes is not a violation of a defendant's constitutional right to confrontation." The court noted there was no evidence that Cody would be prohibited from impeaching A.H. with the evidence excluded under the rape shield statute and that A.H.'s prior sexual contacts with third parties were irrelevant to whether Cody sexually assaulted A.H. Reviewing the admissibility of evidence of A.H.'s relationship with third parties, including past LPD Officers Joseph K. and Jared G., the district court concluded that this evidence had no relevance to A.H.'s relationship to Cody. Further, regarding A.H. having a dating type, the court noted evidence of A.H.'s sexual predisposition was barred by the rape shield statute.

## 3. TRIAL

A jury trial was held in June 2019. Testimony was elicited from A.H.; Janessa Stewart and Amanda "Mandy" Wood, Cody's coworkers at Bryan West hospital; LPD Captain Jake Dilsaver; Cody; Cody's LPD Trainees; NSP Investigators Neal Trantham and Stacie Lundgren; and others. Other evidence was received including text messages exchanged between A.H. and Cody.

### (a) A.H.

At trial, A.H. testified that she was a divorced mother of two children and had mental health diagnoses since she was a teenager including anxiety and attention deficit hyperactivity disorder (ADHD). During 2016 and 2017, A.H. saw a psychiatrist and participated in Targeted Adult Service Coordination (TASC) that provided her with a caseworker to regularly check on her. A.H. testified that in 2016 and 2017, she experienced various triggers which contributed to her mental health issues, such as being a single parent, dealing with her ex-husband, finances, working, and a strained family relationship with her mother. A.H. explained that, in order to deal with her divorce, she would cut her limbs and drink alcohol.

A.H. also testified about her relationship with Cody and how it changed over time. A.H. testified that the night she first met Cody, he told A.H. that he did not think she was crazy; rather, she just had a lot going on in her life. A.H. testified that Cody said she was pretty and asked if she had a Facebook account. A.H. replied yes, and Cody stated that he wanted to help

her and would send her a Facebook request. Cody told A.H. that he was not going to place her in EPC then added that she would owe him but laughed as if he was joking.

According to A.H., approximately a month later, Cody sent her a Facebook friend request which she accepted. A.H. and Cody began communicating via Facebook Messenger but eventually exchanged phone numbers. A.H. listed Cody as "Asshole" in her contacts because of how he treated her and because he said that he liked being an asshole. A.H. testified that, in addition to communicating with each other, they also met at various times and locations depending on Cody's work schedule--meeting at night if Cody was on-duty and during the day if he was not.

A.H. testified that, after a while, Cody began touching her and making sexual comments. A.H. explained that she would pull away or not respond and Cody would laugh and say that he was joking. A.H. testified that Cody soon became more aggressive, began asking her for oral sex, and told her that she owed him for not placing her in EPC. A.H. explained that she rebuffed Cody's initial requests, but Cody eventually forced her head to his lap and told her to "suck his dick." A.H. testified that she complied due to her belief that she had no choice because Cody was a cop.

A.H. testified that over the next several months, she engaged in unwanted sexual contacts with Cody, sometimes resisting his advances, but other times complying with his requests to avoid making him angry. A.H. explained that, if she resisted, Cody would say she owed him or that she needed to be a "good girl" and do what he said. A.H. testified that Cody would also tell her that he could easily place her in EPC and no one would question it because of her history then he would access her LPD history on his computer and show it to her. A.H. stated that Cody would then remark that "[t]his is why I would be believed over you." A.H. believed Cody could ruin her life and that no one would find her credible if she reported him. A.H. testified that Cody might hurt her since he often stated that he enjoyed hurting people that he arrested and liked being written up for excessive force. A.H. testified that she had multiple contacts with Cody in his cruiser, in his personal vehicle, and in her apartment.

A.H. also recalled a number of incidents that occurred at Bryan West where Cody worked part time. Cody instructed A.H. to park her car in an area that was not in view of the security cameras. On at least two occasions, Cody stood by her car door, pulled out his penis, and made her perform oral sex on him. Other times, he would either reach down her shirt or reach down her pants and insert his fingers into her vagina.

A.H. also testified to three events that occurred in her apartment involving Cody and unwanted sexual acts. A.H. explained that one time, Cody arrived wearing his LPD uniform, told her that he missed her, then unzipped his pants and told her to get on her knees. A.H. testified that she complied and performed oral sex on Cody.

A.H. testified that on another occasion, Cody again arrived to her apartment wearing his LPD uniform. A.H. began to perform oral sex on him but before she finished, Cody suggested they have sexual intercourse and helped A.H. to her feet. A.H. explained that Cody bent her over the couch, started to pull down her pants, but she resisted, and they both ended up on the floor. A.H. further explained that Cody eventually pulled A.H. to her feet, pulled down her pants, bent her over the couch, and had sex with her from behind. Cody injured A.H.'s ribs and her knee during this incident.

A.H. also testified that on a third occasion, Cody arrived wearing gym clothes. He said that he wanted to have sex. This time, A.H. did not resist because she did not want to get hurt again. Cody pulled down her pants, performed oral sex on her, and then had intercourse with her. When he was finished, he got dressed and left. A.H. testified that she did not resist him verbally or physically during the third occasion because she still suffered from a knee and rib injury from the prior incident.

A.H. also testified about events that occurred at the Lincoln Children's Zoo. A.H. explained that in June 2017 she met Cody at the Children's Zoo, and he wanted her to kiss him, but she gave Cody a hug instead. A.H. testified that Cody then wrapped his left arm around her neck, shoved his right hand down her pants, and inserted his fingers into her vagina. A.H. tried to leave, but Cody became angry and pushed her up against his cruiser. He told A.H. to be a "good girl" and to stop fighting because he just wanted to make her feel good. Eventually A.H. broke free, and Cody apologized, blaming his medication for making him angry. Shortly after this incident, A.H. did not have contact with Cody for 2½ months.

During the period of time she was not in contact with Cody, A.H. stated that she began hanging around a parking garage in downtown Lincoln to avoid Cody while he was on duty. A.H. would sit on top of the parking garage with her legs dangling over the side resulting in multiple contacts with LPD Officer Robert Hallowell. A.H. told Officer Hallowell that Cody was doing something bad to her and that she wanted it to stop but asked him not to make a report.

A.H.'s contact with Cody resumed on October 15, 2017, when Cody called and wanted to meet her at the zoo. A.H. testified she did not want to see Cody but agreed to meet him because she believed she had no choice. At the zoo, Cody told A.H. to get in the passenger side of his cruiser and asked her for a kiss. A.H. testified that she refused, but Cody grabbed her coat and began pulling her toward him. A.H. resisted but eventually kissed him on the cheek, and he let her go. A.H. testified that Cody also tried to rub her thigh and grab her breasts, but she pushed his hand away. A.H. recalled that eventually Cody exited the cruiser, walked around to the passenger's side, and opened the door. As A.H. attempted to exit the cruiser, Cody pushed her knee to the side, stood between her legs, and demanded that she kiss him, but she refused. Cody then grabbed her neck and shoved her head into the back of the seat. When A.H. tried to push him away, he pressed harder and then leaned in and kissed her on the lips before releasing her. Cody then allowed A.H. to exit the cruiser but grabbed her arm, pushing her up against the cruiser in a "search position" and shoved his hand down her pants stating, "[t]his is the position that you should be in," as he inserted his finger into her vagina. Cody told A.H. that he would contact her later and left.

A.H. testified that, after she climbed the backstop for the second time on October 17, 2017, she awoke in the ICU and that a friend placed her on silent patient status to prevent another individual, not Cody, from gaining access. The evidence established that silent patient status means the hospital will not confirm if a person is a patient there and may require visitors to provide a password before letting them visit the patient. A.H. testified she sent Cody text messages regarding her location and her wellbeing while she was in the ICU but did not recall sending the messages. A.H. testified that Cody visited her while in the ICU but A.H. did not recall if they spoke.

### (b) Janessa Stewart

Stewart testified that after she saw some information in the newspaper about Cody, she contacted NSP to disclose an interaction she had with Cody in the fall of 2017. Stewart explained that she had received a speeding ticket and had the ticket sitting on her desk at the hospital, where both she and Cody worked, when Cody walked by and asked her about it. Stewart explained to Cody that she had to sign up for a STOP class. Stewart testified that her understanding of the STOP class was that it involved answering "a bunch of questions" and that she could not ask someone else to take it for her. Cody told Stewart that he used to teach the in-person STOP class and wanted to know about the online version. Stewart agreed when Cody asked if he could "check it out." Cody gave Stewart his cell phone number and then took Stewart's ticket with him.

Stewart testified that while she was at her desk, she received a text message from an unknown number saying "Test time" and a later text explaining that it was Cody, which made her feel uncomfortable because she did not give Cody her phone number. Cody later texted Stewart again saying "It's done." Stewart learned that Cody had completed her entire 4-hour online STOP class. Stewart was shocked and surprised but thanked Cody and he replied that she owed him and that she "could get him a pop." Stewart responded that she could get him a pop but Cody remarked "No. I just like to see your smiling face is all."

Within the next few days, Cody messaged Stewart on Facebook Messenger saying that she owed him big and could repay him by taking him to dinner, but Stewart deleted those messages because they made her uncomfortable. Stewart also testified that on another occasion, Cody and another person passed by her work desk, Cody stated that Stewart was a bad girl and owed him big. Stewart testified that after that remark, she asked her coworker, Amanda "Mandy" Wood, if she had heard Cody's comment.

On cross-examination, Stewart testified that she had interacted with Cody approximately 10 to 15 times before the STOP incident and that he was never inappropriate with her, never touched her, and never threatened her.

### (c) Amanda "Mandy" Wood

Prior to Wood's testimony, the court gave the jury a limiting instruction that her testimony was only for the limited purpose of helping them decide if Cody had the opportunity, plan, and absence of mistake or accident to commit the sexual assault charge. Wood testified that Stewart received a text message from an unknown number stating "Test time" and later explained that it was Cody. Wood testified that Stewart seemed confused. Wood also recalled that a few weeks later, when Cody and another person walked by in the hallway, Cody told Stewart that she owed him.

### (d) Jake Dilsaver

Captain Dilsaver, an Internal Affairs sergeant from August 2014 to the beginning of 2017, testified that internal affairs investigations focus on serious misconduct such as excessive force, racial profiling, or violations of criminal law. Dilsaver testified that Cody asked him on multiple occasions if there were any complaints about him and that Cody remarked that he was not afraid of being written up or reprimanded. Dilsaver testified that "I remember a particular

complaint when [Cody] was a Southeast officer about-" but the State interrupted and directed him to limit his answer to Cody's statements, to which he responded that he did not recall any.

On cross-examination, Cody's attorney asked, "I heard you start to specifically identify one particular investigation or a situation for IA. Did you start to do that? . . . . And in that particular one you were about to talk about, Mr. Cody was exonerated?" Dilsaver explained that he did begin an investigation but the particular situation Cody's attorney was referencing was handled at the team level and not by internal affairs.

### (e) Cody

Cody testified that he met A.H. in July 2016 during the first incident when she had climbed the backstop. Cody explained that, after that incident, he had to complete his mental health investigation which involved consulting A.H.'s TASC worker and the mental health nurses from the hospital. Cody testified that neither the nurses nor A.H.'s TASC worker believed A.H. was an immediate danger to herself or others and ultimately determined A.H. did not need to be placed in EPC.

Cody testified that, approximately 4 to 6 weeks later, dispatch told him to contact A.H. Cody contacted A.H. and they met and discussed different matters including problems she was having. Cody explained that their relationship progressed to flirtatious behavior including A.H. touching his arm and leg and the parties joking with sexual innuendos. Cody stated that A.H. did not tell him "That's making me feel uncomfortable" or "Don't touch me." Cody did admit to three acts of sexual penetration with A.H. but stated that all three were consensual and occurred while he was off-duty.

### (f) LPD Trainees

In Cody's defense, he called three LPD officers that he had trained during the time period alleged in the information. All three witnesses testified that Cody never did anything inappropriate.

### (g) NSP Investigators Neal Trantham and Stacie Lundgren

Relevant portions of Investigator Trantham's and Investigator Lundgren's testimony will be set forth in the prosecutorial misconduct and the ineffective assistance of counsel sections of this opinion.

### 4. Jury Instructions

Jury instructions relevant to this appeal include jury instruction numbers III and IV. After instructing on the elements of sexual assault, a portion of jury instruction number III provides, in pertinent part:

> If you decide that the State proved beyond a reasonable doubt that A.H. was a person thirteen years or older at the time of the offense, then you must find Gregory S. Cody guilty of Sexual Assault in the First Degree and that the State has proven beyond a reasonable doubt that A.H. was a person thirteen years or older at the time of the offense.

Jury instruction number IV provides: "Intent is an element of Sexual Assault in the First Degree. In deciding whether Gregory S. Cody acted with intent you should consider Mr. Cody's words and acts and all the surrounding circumstances."

## 5. Verdict and Sentencing

The jury returned a verdict of guilty of first degree sexual assault, which the court accepted and also found that the offense constituted an aggravated offense. Thereafter, the court sentenced Cody to 12 to 16 years' imprisonment with credit for 69 days served. The court also required him to register pursuant to the Nebraska Sex Offender Registration Act and noted he would be subject to lifetime community supervision.

## III. ASSIGNMENTS OF ERROR

Cody's assignments of error, consolidated and restated are: (1) the district court erred in finding that Stewart's testimony was admissible; (2) the district court erred in finding that Cody's statements concerning complaints made to Internal Affairs were admissible; (3) the district court erred in precluding evidence that it found was inadmissible under the Rape Shield Statute; (4) the district court erred in giving jury instructions III and IV; (5) there was insufficient evidence to support his conviction; (6) the sentence imposed was excessive; (7) the State committed prosecutorial misconduct when it asked a State witness a series of leading questions that created an inference of a fact that was untrue and inconsistent with the same officer's report; and (8) Cody's trial counsel was ineffective in: (a) failing to renew his motion for a directed verdict and file a motion for a new trial; (b) failing to introduce known and readily available witnesses and documentation to refute the State's case through the presentation of evidence and argument; (c) stopping short of doing a complete cross-examination and thoroughly challenging A.H. and the law enforcement officers, including not recalling A.H. to confront her with the evidence that followed her testimony; (d) failing to introduce evidence to discredit A.H. concerning an allegation she made against Cody that could have easily been refuted and would have revealed her lack of credibility and motive to lie; (e) failing to object to jury instructions III and IV; (f) failing to object to the State committing prosecutorial misconduct; and (g) failing to object to and preserve the issues for appellate review on the character evidence and evidence concerning excessive force and in inducing further evidence on excessive force.

## IV. STANDARD OF REVIEW

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Devers*, 306 Neb. 429, 945 N.W.2d 470 (2020). A trial court's determination of the relevancy and admissibility of evidence must be upheld in the absence of an abuse of discretion. *Id*. Balancing the probative value of evidence against the danger of unfair prejudice is within the discretion of the trial court. *Id*.

Whether jury instructions given by a trial court are correct is a question of law. *State v. Dady*, 304 Neb. 649, 936 N.W.2d 486 (2019). When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below. *Id*.

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Case*, 304 Neb. 829, 937 N.W.2d 216 (2020). Absent an abuse of discretion by the trial court, an appellate court will not disturb a sentence imposed within the statutory limits. *State v. Martinez*, 306 Neb. 516, 946 N.W.2d 445 (2020).

When a defendant has not preserved a claim of prosecutorial misconduct for direct appeal, we will review the record only for plain error. *State v. Price*, 306 Neb. 38, 944 N.W.2d 279 (2020). An appellate court may find plain error on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. *Id*. Generally, we will find plain error only when a miscarriage of justice would otherwise occur. *Id*.

Whether a claim of ineffective assistance of trial counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement. *State v. Theisen*, 306 Neb. 591, 946 N.W.2d 677 (2020). We determine as a matter of law whether the record conclusively shows that (1) a defense counsel's performance was deficient and (2) a defendant was or was not prejudiced by a defense counsel's alleged deficient performance. *Id.*

## V. ANALYSIS

### 1. ADMISSIBILITY OF EVIDENCE REGARDING CODY'S CONTACT WTH STEWART

Cody argues Stewart and Wood were called as the State's "404 witnesses." Cody articulates that their testimonies constitute inadmissible evidence under Neb. Rev. Stat. § 27-404 (Reissue 2016) because their testimonies were not relevant. Additionally, Cody contends that any probative value the testimonies may have had was substantially outweighed by the danger of unfair prejudice as found in Neb. Rev. Stat. § 27-403 (Reissue 2016). Cody further explains that there were only limited similarities between A.H. and Stewart, including their sex, size, and hair color, while there were marked differences between the alleged encounters between him and A.H. and him and Stewart. Regarding the differences, Cody first argues A.H. alleged that Cody forced her to engage in unwanted sexual acts; however, Stewart testified Cody was never inappropriate with her, never touched her, and never threatened her. Second, Cody participated in A.H.'s assessment of the danger to herself or others in July 2016; however, he did not issue Stewart's speeding ticket. Third, he notes the differences governing the implications surrounding A.H.'s possible EPC included a loss of liberty, negative effects on her employment, and difficulties with her custody arrangement while Stewart did not face these same outcomes.

After reviewing the record, we note that, during the course of trial, Cody did not object to Stewart's or Wood's testimony and in fact he cross-examined both witnesses. Because Cody did not object to this line of questioning at trial, he did not preserve this issue for appeal. See *State v. Herrera*, 289 Neb. 575, 856 N.W.2d 310 (2014) (to preserve any error for appellate review, party must make timely and specific objection to evidence offered at trial that was part of pretrial ruling discussing admissibility of that evidence). A party may not waive an error, gamble on a favorable result, and, upon obtaining an unfavorable result, assert the previously waived error. *Id.* Because we find the State's offer of this testimony does not amount to plain error, Cody's first assignment of error fails.

## 2. ADMISSIBILITY OF EVIDENCE REGARDING CODY'S STATEMENTS CONCERNING COMPLAINTS

Cody argues that the evidence of prior complaints to the Internal Affairs elicited through Officer Dilsaver should have been excluded because the evidence was irrelevant. Furthermore, he argues that any probative value such evidence might have had was substantially outweighed by the danger of unfair prejudice as codified in § 27-403.

Dilsaver testified that he worked for Internal Affairs investigating serious complaints, the nature of which included excessive force, racial profiling, or violations of criminal law. Dilsaver recalled that Cody stated he was not afraid of being written up or reprimanded and that Cody would ask if any complaints had been filed against him. Dilsaver began recalling "a particular complaint when [Cody] was a Southeast Officer about -- " but the State cut him off and redirected him to limit his answer to only Cody's statements, which statements he could not recall. Cody argues this exchange allowed the jury to infer that Cody was asking if there were any serious complaints against him, such as violations of criminal law, suggesting Cody had a disposition to engage in that type of behavior. Specifically, his counsel argues that "Cody's position as a sworn police officer, funded by taxpayer dollars, engaging in repeated conduct of the nature described certainly gave the jury a reason to find against Cody and misapply the evidence."

While Cody argues on appeal that this elicited evidence was in error, he did not object to this line of questioning at trial. Additionally, in Cody's assignment of error regarding ineffective assistance of counsel, Cody acknowledges that his attorney failed to object to this line of questioning. Therefore, because Cody failed to object to this line of questioning, he did not preserve this issue for appeal. See *State v. Munoz*, 303 Neb. 69, 927 N.W.2d 25 (2019) (in absence of plain error, where issue is raised for first time in appellate court, it will be disregarded inasmuch as lower court cannot commit error in resolving issue never presented and submitted to it for disposition). Because we find the State's offer of limited testimony governing Cody's statements to Internal Affairs does not amount to plain error, this assignment of error fails.

## 3. ADMISSIBILITY OF EVIDENCE PURSUANT TO RAPE SHIELD STATUTE

Cody next assigns that the district court erred in failing to allow certain evidence he attempted to propound based upon an erroneous application of the Nebraska Rape Shield statute.

Prior to trial, Cody filed a motion governing his intent to present certain evidence involving prior sexual-related relationships and accusations involving A.H., which Cody argued were excepted from the rape shield law. That evidence included various incidents which Cody described as "a pattern of behavior regarding false allegations of sexual assault" as well as other incidents including "[e]vidence regarding the alleged victim's romantic and/or sexual relationship with former [LPD] officers" Joseph K. and Jared G.

Following a hearing on the subject, the district court issued a multi-page order in which the court found that, in relation to prior false sexual assault allegations, pursuant to *State v. Swindle*, 300 Neb. 734, 915 N.W.2d 795 (2018), Cody failed to show that each of the allegations of false reporting met the threshold test for admissibility under *Swindle*. And as to the "[e]vidence regarding the alleged victim's romantic and/or sexual relationships with former [LPD] officers" Joseph K. and Jared G., the district court provided, in relevant part:

> In his brief, [Cody] argues that he should be allowed to ask A.H. whether she has had an intimate relationship with "eight other men" listed in his motion and notice. Citing *State v. Lavalleur*, 289 Neb. 102[, 853 N.W.2d 203] (2014), [Cody] urges that the proposed line of questioning is permissible under Nebraska's Rape Shield statute because he does not intend to inquire into specific sexual activities.
>
> In *Lavalleur*, the Nebraska Supreme Court held that a victim's relationship with a third party at the time of the alleged sexual assault was not evidence of "sexual behavior" or "sexual predisposition" and such evidence was relevant in establishing her potential motive to falsely accuse [Cody] of sexual assault. The Nebraska Supreme Court specifically stated that "[q]uestioning about the existence of a relationship between the complaining witness and a third party does not, by itself, implicate either form of evidence regulated by § 27-412." *State v. Lavalleur*, 289 Neb. 102, 111, 853 N.W.2d 203, 212 (2014), disapproved on other grounds in later appeal, 292 Neb. 424, 873 N.W.2d 155 (2016). According to the Nebraska Supreme Court's holding in *Lavalleur*, [Cody] may ask A.H. whether she had an intimate relationship with a third party during the relevant time period without violating the rape shield statute. However, to the extent [Cody] intends to ask A.H. about her relationship with "eight other men" listed in his motion and notice, the court finds such evidence irrelevant, because any contact A.H. had with these men occurred during a different time frame than the alleged sexual assaults committed by [Cody]. Unlike in *Lavalleur*, A.H.'s relationship with third parties has no relevance to her relationship with [Cody]. Thus, [Cody] should confine his questioning to whether A.H. had an intimate relationship with a third party during the relevant time frame, July 20, 2016[,] to October 16, 2017.

Cody's motion governing Rule 27-412 dealt with multiple individuals and incidents the subject of which he desired to inquire about with the victim. At trial, he similarly dealt with all such incidents with a single offer of proof governing multiple exhibits as shown through the following colloquy:

> [Defense Counsel]: Okay. Judge, before I begin my cross-examination of [A.H.], I need to renew my motions in limine that the court had ruled on previously. I also need to do an offer of proof in support of that motion in limine.

I guess first -- I guess the issues of the motion in limine itself, and if I could just have a moment, Judge, I have your order here. And specifically as it relates to -- bear with me here. One moment please.

Well, I guess, Judge, frankly instead of parsing out portions of the order or our different motions in limine, I guess I'm just going to I guess reinstitute all of my motions in limine and ask that those essentially be taken up by the court again.

And in support of those motions in limine I would offer what I had offered on the April 22nd pretrial conference hearing date. That's gonna be Exhibit 3, Exhibit 4, Exhibit 5, Exhibit 6, Exhibit 8, Exhibit 11, 12, and 13.

Oh, I'm sorry. And there's some more, I'm sorry. 20 through 23 as well.

And so again those were previously offered and received back on April 22nd. Judge, I'm asking -- I'm offering them again in support of my renewed motions in limine that I'm orally making now. But those motions in limine that I'm orally making now are identical to those that I had filed written with the court prior to that April 22nd date.

So I believe that is my offer of proof.

I would also ask, then, Judge, for a continuing objection based on those motions in limine during my cross-examination of [A.H.].

THE COURT: State?

[Prosecutor]: Your Honor, I don't have any objections to those exhibits for the purpose of [Cody's] offer of proof with the understanding that those exhibits still remain sealed and obviously aren't going to go back to the jury. And I'd ask the court to just make another order consistent with the court's previous order on these same issues.

THE COURT: All right. So [Cody's] renewed motion is denied and the order is as previously ruled upon. And, of course, you can have -- you know, your continuing objection but you want to let me know, you know, when that is and what specifically at the time during the testimony.

[Defense Counsel]: And with the court's permission I guess the way I was thinking about this is yes, if we get into that -- if something like that I would absolutely want to approach first. I will not do that in front of the jury obviously.

That also goes through -- and we've had discussions like this kind of informally to some degree, but I think both [the prosecutor] and I are aware that if certain doors are opened so to speak, then we may be going down different paths. It is my intent, Judge, that if I believe such a door has been opened and we are headed down a different path, I will approach and discuss that with the court and [the prosecutor] and the parties.

THE COURT: All right. Very good.

[Defense counsel]: Fair enough?

THE COURT: Very good. All right?

[Prosecutor]: Yes.

THE COURT: Thank you both. And that concludes your offer of proof?

[Defense counsel]: It does, Judge.

Now, on appeal, Cody does not assign error and argue that portion of the district court's ruling governing prior allegedly false sexual assault allegations. Instead, Cody argues:

In portraying A.H.'s relationship as one of coercion as opposed to romantic or secret, the State['s] attorney went through a series of questions concerning categories of things people would traditionally do if they were in a romantic relationship. A.H. testified that the two did not go on trips, out to eat, to movies, or to hotels. She further testified that she did not buy him gifts. Additionally, A.H. testified that many of the sexual acts resulted in pain, discomfort, or injury. Finally, she testified that she was intimidated by his status as a police officer and essentially cowered to his authority. To contrast the State's portrayal of A.H., Cody's attorney sought to introduce evidence concerning her relationships with two police offers during a relevant timeframe as well as other false reports she had made of sexual assault. One officer gave A.H. money referred to as "hush money." The evidence not allowed in corroborated the defense theory that A.H. sought attention from law enforcement officers and men in uniform, was physically attracted to men in uniforms, engaged in sexual relationships with men that did not involve dinners, movies, hotel, trips and buying gifts for the men, and liked rough sexual interactions. This was not meant to embarrass A.H. Rather, it was meant to combat the portrayal of A.H. as someone who would not engage in a sexual relationship without diners, movies, hotels, trips and gift exchanges. It was meant to combat the portrayal that A.H. did not like rough sexual interactions. It was meant to combat the portrayal that A.H. was intimidated by men in uniforms. It was meant to show her familiarity with police officers in that degree of a relationship as opposed to portraying her as someone that only had negative relationships with police officers.

Brief for appellant at 33-34 (citations omitted). In short, Cody is arguing that, during the course of the trial, the State's portrayal of A.H. as not being treated romantically by Cody so as to suggest a nonconsensual relationship opened the door to at least some evidence about her prior relationships with officers Joseph K. and Jared G. and should have been allowed for that purpose.

But contrary to Cody's argument now on appeal, no such argument was presented to the district court during trial. As recited above, in his pretrial motion and associated hearing, Cody presented an entire host of prior sexual-related incidents he desired to offer at trial. During trial, he then attempted to offer all such exhibits governing all such alleged incidents at the same time. In support of his offer, he referred to the court's prior rulings and gave no indication that all, or any part of the exhibits being offered, were for a different reason than articulated during the prior hearing. In fact, counsel alluded to the fact that if something changed, counsel would bring it to the attention of the court. Counsel never did again offer all, or part of, the collection of exhibits it attempted to offer at one time, nor provided the court with any other basis for admitting some or all of the exhibits.

Now, for the first time on appeal, Cody attempts to argue that some of this evidence (first presented with his motion and then later offered all together), became relevant based upon evidence offered by the State during the course of trial, although counsel never specifies what specific exhibit or exhibits, would have been allowed into evidence following the prosecutor's "opening the door" to that evidence through its examination of A.H. But as the Nebraska Supreme Court has continuously held under such circumstances, "In the absence of plain error,

where an issue is raised for the first time in an appellate court, it will be disregarded inasmuch as a lower court cannot commit error in resolving an issue never presented and submitted to it for disposition." *State v. Munoz*, 303 Neb. 69, 75, 927 N.W.2d 25, 32 (2019).

Here, following the prosecutor's questioning of A.H. at trial, Cody never raised the issue to the district court that he is raising now, that is, that the State opened the door to some of the evidence it first presented to the district court during the pretrial hearing. Nor can we determine from Cody's argument what portion of what exhibit he believes should have been allowed to refute testimony offered by the State. Because the district court was never presented with the specific evidence Cody claims became relevant or the basis for that claim, this assignment will be disregarded as a district court cannot commit error regarding an issue never presented to it for disposition.

### 4. JURY INSTRUCTIONS

Cody's fourth assigned error is that the district court erred in giving jury instructions III and IV because they "incorrectly stated the law and were confusing and misleading." Brief for appellant at 34.

During the jury instruction conference, Cody did not object to any of the jury instructions proposed by the court including jury instructions III and IV. The failure to object to a jury instruction after it has been submitted to counsel for review precludes raising an objection on appeal absent plain error. *State v. Hinrichsen*, 292 Neb. 611, 877 N.W.2d 211 (2016); *State v. Barber*, 28 Neb. App. 820, 948 N.W.2d 306 (2020). Plain error may be found on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. *State v. Mann*, 302 Neb. 804, 925 N.W.2d 324 (2019); *State v. Barber, supra*. Since Cody did not object to the jury instructions, we review only for plain error.

### (a) Jury Instruction III

Cody argues that jury instruction III was erroneous because it includes a sentence that he contends suggests the jury was required to find him guilty if it determined that A.H. was 13 years of age or older. The entirety of jury instruction III provided as follows:

**I. SEXUAL ASSAULT IN THE FIRST DEGREE**

Depending on the evidence, you may return one of three possible verdicts on the charge of Sexual Assault in the First Degree:

1. Not Guilty; or

2. Guilty of Sexual Assault in the First Degree and the State <u>did</u> prove A.H. was a person thirteen years or older; or

3. Guilty of Sexual Assault in the First Degree and the State <u>did not</u> prove A.H. was a person thirteen years or older.

A. Elements

Regarding the crime of Sexual Assault in the First Degree, the State must prove beyond a reasonable doubt that Gregory S. Cody:

1. Subjected A.H. to sexual penetration; and

2. Did so without the consent of A.H.; and

3. Did so on, about, or between July 20, 2016 and October 16, 2017, in Lancaster County, Nebraska.

### B. Effect of Findings

You must decide whether the State proved each element beyond a reasonable doubt. If the State did so prove each element, then you must find Gregory S. Cody guilty of Sexual Assault in the First Degree. Otherwise, you must find Gregory S. Cody not guilty.

If you find from the evidence that Gregory S. Cody is guilty of Sexual Assault in the First Degree, then you must next unanimously decide whether the State has proved beyond a reasonable doubt that A.H. was a person thirteen years or older at the time of the offense. If you decide that the State proved beyond a reasonable doubt that A.H. was a person thirteen years or older at the time of the offense, then you must find Gregory S. Cody guilty of Sexual Assault in the First Degree and that the State has proven beyond a reasonable doubt that A.H. was a person thirteen years or older at the time of the offense. If you decide that the State has not proven beyond a reasonable doubt that A.H. was a person thirteen years or older at the time of the offense, you must find Gregory S. Cody guilty of Sexual Assault in the First Degree and that the State has not proven beyond a reasonable doubt that A.H. was a person thirteen years of older at the time of the offense.

The burden of proof is always on the State to prove beyond a reasonable doubt all of the elements of the crime charged, and this burden never shifts.

"In construing an individual jury instruction, the instruction should not be judged in artificial isolation but must be viewed in the context of the overall charge to the jury considered as a whole." *State v. Ely*, 295 Neb. 607, 622, 889 N.W.2d 377, 392 (2017).

"Because lifetime community supervision is an additional form of punishment, a jury, rather than a trial court, must make a specific finding concerning the facts necessary to establish an 'aggravated offense' where such facts are not specifically included in the elements of the offense of which the defendant is convicted." *State v. Alfredson*, 282 Neb. 476, 482, 804 N.W.2d 153, 157 (2011). Pursuant to Neb. Rev. Stat. § 29-4001.01(1) (Reissue 2016), the definition of "aggravated offense" includes "any registrable offense under section 29-4003 which involves the penetration of, direct genital touching of, oral to anal contact with, or oral to genital contact with (a) a victim age thirteen years or older without the consent of the victim . . ."

Upon reviewing the entirety of jury instruction III, it is apparent that the "Effect of Findings" section of the jury instruction III consists of an explanation to the jury of how different factual findings the jury might reach corresponded to the alternative verdicts presented to the jury and their application to the required jury findings regarding whether Cody committed the crime of first degree sexual assault and whether the offense constituted an aggravated offense as defined by § 29-4001.01(1)(a). Because jury instruction III adequately states the law and is not misleading, we find no plain error.

(b) Jury Instruction IV

Cody contends that jury instruction IV incorrectly advised the jury that intent is an element of first degree sexual assault. Jury instruction IV provides: "Intent is an element of Sexual Assault in the First Degree. In deciding whether Gregory S. Cody acted with intent you should consider Mr. Cody's words and acts and all the surrounding circumstances."

A similar argument was addressed by the Nebraska Supreme Court in *State v. Koperski*, 254 Neb. 624, 639-40, 578 N.W.2d 837, 847 (1998):

> Finally, pursuant to *State v. Trackwell,* 244 Neb. 925, 509 N.W.2d 638 (1994), the Court of Appeals found that the trial court did not err in refusing Koperski's proffered instruction because intent was not an element of first degree sexual assault and that the focus of the proffered instruction impermissibly shifted the inquiry from the wrongful conduct of Koperski to the state of mind of K.O. Further, the Court of Appeals stated that the trial court erred in its instructions in favor of Koperski when it required the State to prove that Koperski *intentionally* subjected K.O. to sexual penetration. We address the issue of intent because this cause is being remanded for a new trial.

> In *State v. Trackwell, supra*, the defendant was convicted by a jury of first degree sexual assault. We vacated the conviction on the grounds of improper comment by the prosecutor during closing arguments. We then addressed Trackwell's assigned error regarding the trial court's failure to instruct the jury on intent as an element of first degree sexual assault. We concluded that intent was not an element of first degree sexual assault as defined by the statute and therefore found no error in the court's instruction.

> The absence of words in a statute requiring a certain mental state does not warrant the assumption that the Legislature intended to impose strict liability. To the contrary, at least for an offense as serious as sexual assault, it should be presumed that the Legislature intended to follow the usual mens rea requirement unless excluded expressly or by necessary implication. See 1 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 5.1(b) (1986).

> While it is correct that § 28-319(1)(a) does not expressly state any requisite level of criminal intent with regard to any of the elements of the crime and first degree sexual assault is clearly not a specific intent crime, we conclude that first degree sexual assault under § 28-319(1)(a) is, nevertheless, a general intent crime. See, *State v. Smith*, 210 Conn. 132, 136, 554 A.2d 713, 715 (1989) ("'[i]t is well settled that first degree sexual assault is a general intent crime'"); *Peck v. Dunn*, 574 P.2d 367 (Utah 1978) (murder, rape, and kidnapping are examples of general intent crimes); *Sanchez v. State*, 567 P.2d 270 (Wyo. 1977) (rape is commonly classified as general intent crime) [*overruled on other grounds, Bean v. State*, 2016 WY 48, 373 P.3d 372 (Wyo. 2016)]. As a general intent crime, criminal intent is inferred from the commission of the acts constituting the elements of the crime of first degree sexual assault. *State v. Smith, supra*; *State v. Boone*, 307 N.C. 198, 297 S.E.2d 585 (1982) [(*disapproved on other grounds, State v. Richmond*, 347 N.C. 412, 495 S.E.2d 677 (1998)]; *State v. Keyonnie*, 91 N.M. 146, 571 P.2d 413 (1977); *Sanchez v. State, supra.* Therefore, the only burden on the prosecution in order to prove general criminal intent under § 28-319(1)(a) is to prove beyond a reasonable doubt

that the accused subjected another person to sexual penetration and overcame the victim by force, threat of force, coercion, or deception. To the extent that our decision in *State v. Trackwell, supra,* conflicts with this opinion, it is expressly disapproved. Thus, the foregoing reasoning leads us to conclude that the Court of Appeals was correct regarding the issue of requisite intent when it stated that the district court erred by instructing the jury that Koperski must have *intentionally* sexually penetrated K.O. **but that such error was not prejudicial to Koperski.**

(Emphasis in bold type supplied.) See *State v. Sanchez*, 257 Neb. 291, 597 N.W.2d 361 (1999) (to obtain conviction in this case pursuant to § 28-319(1)(c), State needed to prove only that defendant subjected victim to sexual penetration at time when he was over age of 19 and she was under age of 16).

Similar to the Nebraska Supreme Court's holding in *Koperski*, although it was error for the district court to instruct the jury that Cody must have intentionally sexually penetrated A.H., such error was not prejudicial to Cody as it presented an additional element that was unnecessary for Cody's conviction. Because the district court's inclusion of this additional element of intent did not prejudice Cody, this assignment fails.

### 5. SUFFICIENCY OF EVIDENCE

Cody's fifth assigned error is that the evidence was insufficient to support his conviction. He argues that "[t]here was a complete lack of evidence to support that the sexual penetration was not consensual beyond A.H.'s mere allegations to the same." Brief for appellant at 37.

But contrary to Cody's argument, the State is not required to corroborate a victim's testimony in cases of first degree sexual assault; if believed by the finder of fact, the victim's testimony alone is sufficient. *State v. Martinez*, 306 Neb. 516, 946 N.W.2d 445 (2020); *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019). See, also, Neb. Rev. Stat. § 29-2028 (Reissue 2016) (testimony of person who is victim of sexual assault "as defined in sections 28-319 to 28-320.01" shall not require corroboration).

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Case*, 304 Neb. 829, 937 N.W.2d 216 (2020). Because after reviewing A.H.'s testimony we find that a rational trier of fact could have found essential elements of the offense of first degree sexual assault beyond a reasonable doubt, this assigned error fails.

### 6. EXCESSIVE SENTENCE

Cody's sixth assigned error is that the sentence imposed was excessive. Cody was convicted of aggravated first degree sexual assault, a Class II felony, which is punishable by 1 to

50 years' imprisonment. § 28-319(2) (first degree sexual assault); § 29-4001.01 (aggravated offense). Cody's sentence of 12 to 16 years' imprisonment was within the statutory limits.

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Price*, 306 Neb. 38, 944 N.W.2d 279 (2020). In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id.* The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id.*

Here, the presentence investigation report (PSR) indicated that Cody was 56 years old, married, with two dependents. He had been employed with the Lincoln Police Department for 27 years prior to resigning due to this charge resulting in his conviction and had no prior criminal convictions. The level of service/case management inventory assessed that Cody was in the low risk range to reoffend. The PSR also included numerous letters of support for Cody. Cody denies A.H.'s version of events stating that he had oral sex with the victim twice and intercourse once and that all sexual contact was consensual.

During the sentencing hearing, the court noted that it had considered the relevant factors and stated:

> This began with you as a uniformed officer rescuing the victim, a person with some serious mental health problems, at the ballfields at Holmes Lake Park. Over the course of approximately one year your behavior went from that of a trusted community servant to abusive sexual assault. And it's a twisted assertion to call it an affair. It was not romantic, it was illicit, your motivation appeared to escalate for personal gratification to frustration and control.
>
> . . . .
>
> Ultimately the nature of the crime was one where you abused your authority and trust given to you by a member of the Lincoln community, one you were supposed to protect and serve.
>
> And the presence or absence of violence, and the crime of sexual assault was forceful and violent.
>
> Other factors I've considered, I've considered your community support. I've received many letters and I've read them all and I am also considering the safety of the community, which is paramount in this case.

Although Cody has no prior criminal history, he has been convicted of a Class II felony which the district court determined was an aggravated offense. Based on the factors including that the sentence imposed is on the low end of the statutory sentencing range; the offense for which he has been convicted is a serious offense causing harm to the victim; and in committing

the offense, Cody abused the public trust placed in him as a police officer, we cannot say that the sentence imposed was an abuse of discretion. This assigned error fails.

### 7. PROSECUTORIAL MISCONDUCT

Next, Cody contends that the State committed prosecutorial misconduct "when it asked a State witness [Investigator Trantham] a series of leading questions that created an inference of a fact that was inconsistent with the same officer's report and [was] untrue." Brief for appellant at 3.

Prosecutorial misconduct prejudices a defendant's right to a fair trial when the misconduct so infected the trial that the resulting conviction violates due process. *State v. Gonzales*, 294 Neb. 627, 884 N.W.2d 102 (2016). Whether prosecutorial misconduct is prejudicial depends largely upon the context of the trial as a whole. *State v. Hernandez*, 299 Neb. 896, 911 N.W.2d 524 (2018). In determining whether a prosecutor's improper conduct prejudiced the defendant's right to a fair trial, an appellate court considers the following factors: (1) the degree to which the prosecutor's conduct or remarks tended to mislead or unduly influence the jury; (2) whether the conduct or remarks were extensive or isolated; (3) whether defense counsel invited the remarks; (4) whether the court provided a curative instruction; and (5) the strength of the evidence supporting the conviction. *State v. Cotton*, 299 Neb. 650, 910 N.W.2d 102 (2018), *disapproved on other grounds, State v. Avina-Murillo*, 301 Neb. 185, 917 N.W.2d 865 (2018).

Cody's brief directs this court to the portions of Investigator Trantham's testimony where he identifies that the State committed prosecutorial conduct by asking leading questions. The portions of that testimony occurred on direct examination by the State:

Q. But [A.H.'s] on the phone with Mr. Cody so it's gonna be harder to hear what he's saying from the pocket record[er] and the room recorder?

A. Right. He was not on speakerphone but we could hear parts of what he was saying because of the -- just the volume that her phone was set at but she was -- she did not have the speakerphone turned up very loud.

Q. During the first phone call [A.H.] had with Mr. Cody, you said that you were able to hear parts of Mr. Cody's responses or parts of his conversation with [A.H.]?

A. Right.

Q. Can you tell us what you recall Mr. Cody saying during that first phone call?

A. Sure. He acknowledged an incident of some nature involving unwanted acts against [A.H.] He expressed --

[Defense Counsel]: Judge, can we approach briefly on this?

THE COURT: Yes.

(Conversation at the bench in low tones.)

[Defense Counsel]: This is that same first controlled call that the court did not allow played because you can't hear any of the defendant's statements. So we're in that same situation where now we're saying that we have a recording that the defendant is saying something and we have a witness interpreting what that recording was. We can't hear the recording. There's no way to verify that these are [Cody's] statements.

[Prosecutor]: I don't think that a witness is interpreting what he is hearing from the recording. The witness was there in the room and could hear as the conversation's going that (sic) Mr. Cody was saying, so he's testifying as to what he remembers Mr. Cody saying. Again I think it just goes to weight and I think the severity of that, we don't have the recording part of the conversation.

[Defense Counsel]: He already said just now that Mr. Cody acknowledged some inappropriate behavior or something like that. We can't hear [Cody] say that. [A.H.] didn't testify that she said that. I mean we were all reading the transcription, we've already been through this.

Judge, here's my problem. I understand [Cody's] statement comes in, but if you're saying that these are recorded statements and this is what [A.H.] recorded, that's inappropriate. No one else can hear that and they're not -- this court --

THE COURT: He's not saying that it was recorded.

[Defense Counsel]: Yeah, he is.

THE COURT: Did I miss something?

[Defense Counsel]: Yeah, he's saying they were recorded.

THE COURT: What I heard him say was he tried to record it, but he's repeating what he actually heard [Cody] say. Those are [Cody's] statements.

Now I don't want any summaries of loose descriptions of what he heard but he's saying -- if you ask him, did [Cody] say the sky is blue? Yes, I heard him say that it was blue.

[Defense Counsel]: Okay. Well, let me ask you this, Judge.

THE COURT: It doesn't matter if it's recorded.

[Defense Counsel]: Because if I wanted the controlled call -- we don't hear a damn thing.

THE COURT: He's not testifying from the call. He's testifying from what he heard. That's what I'm getting.

[Defense Counsel]: Nobody else can hear it.

[Prosecutor]: Right.

THE COURT: Nobody else can hear it when the cop comes up to the guy on the street and the guy says, yeah, I robbed that store. But the cop can still come in and testify and say the defendant said he robbed the store.

[Defense counsel]: But if the cop is saying hey, it's on my body cam I got him recorded saying it and all of a sudden you don't hear that, that's not coming in.

THE COURT: Well, that's another -- you can argue that about weight because you're just saying that -- and you can certainly cross-examine. There was nothing you couldn't hear that's on the recorder, that's fine. Cross-examine all you want about that. I think it's perfectly clear to the jury that he can't hear Cody on the recording. We're talking about the recording. Maybe, you know, maybe you can mark some of the weight off of it and that's fine, that's your cross. But it's not an admissibility issue. It's his statements that he's reporting. So I'm gonna overrule that.

(The following proceedings were had in normal tones.)

. . . .

- 23 -

Q. . . . Investigator Trantham, you were -- I asked you what you could hear Mr. Cody say during this conversation, so if you could continue with your answer?

A. Sure. He acknowledged [A.H.'s] statement something to the effect that something unwanted had happened, and he expressed concern that if that information was revealed that he would lose his job.

Q. Do you recall anything else specifically that Mr. Cody said during this conversation that you could hear while the phone call was taking place?

A. I don't remember the specific statements but he was trying to --

[Defense Counsel]: Judge, I'm gonna object at this point. If we're not remembering specific statements that's inappropriate.

THE COURT: I'll sustain the objection.

. . . .

Q. . . . So you heard Mr. Cody acknowledge that there was some incident of some unwanted contact between himself and [A.H.], correct?

A. Right.

Q. And that if that information was revealed or released that he would lose his job?

A. Right.

Q. So there was some concern on his part about that?

A. Yes.

Throughout this entire portion of the record where Cody has directed this court, Cody's trial counsel failed to make a continuing objection following the extensive sidebar and the district court sustained Cody's one objection thereafter. Failure to make a timely objection waives the right to assert prejudicial error on appeal. *State v. Swindle*, 300 Neb. 734, 915 N.W.2d 795 (2018). Since the district court sustained the one objection posed by Cody's counsel, there can be no error claimed. Further, since Cody's counsel did not otherwise object, any error in allowing the evidence elicited through these questions has not been preserved for appellate review; however, we do conduct a review for plain error. Finding none, this assigned error fails.

## 8. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Cody's final assignment of error is that his trial counsel was ineffective in: (a) failing to renew his motion for a directed verdict and file a motion for a new trial; (b) failing to introduce known and readily available witnesses and documentation to refute the State's case through the presentation of evidence and argument; (c) stopping short of doing a complete cross-examination and thoroughly challenging A.H. and the law enforcement officers, including not recalling A.H. to confront her with the evidence that followed her testimony; (d) failing to introduce evidence to discredit A.H. concerning an allegation she made against Cody that could have easily been refuted and would have revealed her lack of credibility and motive to lie; (e) failing to object to jury instructions III and IV; (f) failing to object to the State committing prosecutorial misconduct; and (g) failing to object to and preserve the issues for appellate review on the character evidence and evidence concerning excessive force and in inducing further evidence on the excessive force.

Cody is represented on direct appeal by different counsel than trial counsel. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. *State v. Devers*, 306 Neb. 429, 945 N.W.2d 470 (2020). Once issues of trial counsel's ineffective performance are properly raised, the appellate court will determine whether the record on appeal is sufficient to review the merits of the ineffective performance claims. *Id*.

To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Iddings*, 304 Neb. 759, 936 N.W.2d 747 (2020). To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *State v. Anderson*, 305 Neb. 978, 943 N.W.2d 690 (2020). To show prejudice in a claim of ineffective assistance of counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Id*. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

A claim of ineffective assistance of counsel need not be dismissed merely because it is made on direct appeal. *State v. Sherrod*, 27 Neb. App. 435, 932 N.W.2d 880 (2019). The determining factor is whether the record is sufficient to adequately review the question. *Id*. In order to know whether the record is insufficient to address assertions on direct appeal that trial counsel was ineffective, appellate counsel must assign and argue deficiency with enough particularity (1) for an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) for a district court later reviewing a petition for postconviction relief to be able to recognize whether the claim was brought before the appellate court. *Id*. When a claim of ineffective assistance of trial counsel is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel. *Id*.

An appellate court determines as a matter of law whether the record conclusively shows that (1) a defense counsel's performance was deficient or (2) a defendant was or was not prejudiced by a defense counsel's alleged deficient performance. *State v. Stelly*, 304 Neb. 33, 932 N.W.2d 857 (2019).

#### (a) Failure to Renew Motion for Directed Verdict
#### and File Motion for New Trial

Cody's first claim of ineffective assistance of trial counsel is that his counsel failed to renew his motion for a directed verdict and file a motion for a new trial. He contends that the grounds existing entitling him to a new trial included his arguments raised on appeal "pertaining to the [district court's] evidentiary rulings, jury instructions, and prosecutorial misconduct." Brief for appellant at 53. Having determined that Cody's evidentiary claims and prosecutorial misconduct claims failed and that his jury instruction claim resulted in no prejudice to Cody, Cody cannot show that he was prejudiced by his counsel's failure to renew his motion for a

directed verdict or failure to file a motion for new trial on the aforementioned bases. We find the record is sufficient as a matter of law to resolve this claim without an evidentiary hearing. This claim of ineffective assistance of counsel fails because the claimed error was not prejudicial to Cody.

### (b) Failure to Introduce Evidence to Refute A.H.'s Claims

Cody's second claim of ineffective assistance of trial counsel is that his counsel failed to introduce evidence to refute A.H.'s claims by compiling evidence from witnesses and documentation "to create a calendar that would have refuted the number of opportunities that A.H. claimed they were together, let alone sexually involved." Brief for appellant at 54-55. Specifically, Cody claims that, between his employment; two surgeries; physical therapy appointments; a conference in Denver, Colorado; a test in Bellevue; A.H's testimony that "she was in school, maintained employment, and did not engage in sexual acts with Cody during the time she had her children;" "documentation with supporting illustration would have served to impeach A.H. to such an extent [regarding the number of times that she and Cody were sexually involved] that her credibility issues would have been exposed." Brief for appellant at 55.

However, a review of the record and the evidence adduced reveals that much, if not all, of this evidence was admitted into evidence; it was just not admitted into evidence in Cody's preferred form, i.e. a calendar. Accordingly, we understand Cody's argument here to be that this evidence would have been more persuasive if reduced to the form of a calendar as opposed to being presented through the course of the trial.

A similar argument was made by the defendant in *State v. Torres*, 295 Neb. 830, 894 N.W.2d 191 (2017). In *Torres*, defense counsel raised the issue of potential contamination of DNA evidence through the cross-examination of the State's witness. Following the defendant's convictions, defendant's replacement counsel argued that trial counsel was ineffective for having then failed to call a defense expert to discuss the same subject matter raised by trial counsel during cross-examination. In finding that defense counsel was not ineffective, the Nebraska Supreme Court held that the decision not to call a separate witness governing the same subject matter amounts to trial strategy as the testimony would have been cumulative.

The same can be said here as Cody's argument that his trial counsel should have presented this evidence in a different form amounts to an issue of reasonable trial strategy and would have been cumulative of evidence offered throughout the trial. The record is sufficient to reach this claim of ineffective assistance of counsel without an evidentiary hearing. This specific assignment of error fails because trial counsel was not ineffective.

### (c) Failure to Conduct Complete Cross-Examination of A.H. and Law Enforcement Officers

Cody's third claim of ineffective assistance of trial counsel is that his counsel stopped short of performing a complete cross-examination and thoroughly challenging A.H. and law enforcement officers, including not recalling A.H. to confront her with the evidence that followed her testimony. We will briefly examine each of the specific claims Cody makes in connection with this assignment in which we ultimately hold the record is either sufficient to find

that Cody's trial counsel was not ineffective, the claimed error was not prejudicial, or that the claim is lacking in specificity.

Cody first contends that his counsel was ineffective in failing to object or further cross-examine A.H.'s testimony that he "was on-duty during the first incident of penile-vaginal intercourse to which she responded yes without any foundation for the same." Brief for appellant at 56. The record establishes that trial counsel's failure to object or further cross-examine A.H. regarding this testimony was not prejudicial because, whether Cody was on or off duty has no bearing on whether the act itself was a sexual assault or was consensual. This alleged claim fails because the claimed error was not prejudicial.

Cody next contends that trial counsel was ineffective in failing to ask A.H. why she continued to perform oral sex in his police cruiser if it made her physically uncomfortable; however, this line of inquiry was essentially covered by similar lines of questioning regarding why A.H. continued to talk to Cody and meet with him if he was assaulting her. As stated previously, trial counsel's failure to pursue a cumulative line of questioning amounts to trial strategy and does not constitute ineffective assistance of counsel. See *State v. Torres, supra*. This alleged claim fails because trial counsel was not ineffective.

Cody's third contention is that trial counsel should have confronted A.H. with his statements that he was under the impression that she "liked it rough" and that if she did not want to continue with the relationship she could have told him to leave and not bother her again. Since A.H. admitted that Cody had said both things to her, trial counsel was not ineffective in failing to further "confront" her with these statements. Because further cross-examination of A.H. governing a topic which she previously admitted would be cumulative, this allegation amounts to trial strategy and fails because the record is sufficient to find that Cody's counsel was not ineffective for failing to further pursue it.

Cody's fourth contention is that A.H. testified that her breast surgery was performed by Cody's sister but complains that it was not addressed on cross-examination in an "adverse way." Brief for appellant at 57. This evidence is irrelevant to whether Cody sexually assaulted A.H. Trial counsel's failure to further question A.H. regarding this evidence did not constitute ineffective assistance of counsel.

Cody's fifth contention is that A.H.'s testimony regarding a February 15, 2017, traffic stop where she was pulled over for speeding should have been more closely examined because A.H. testified that she and Cody were messaging prior to her being pulled over and Cody's version was that she initiated a call to him once she was pulled over. This minor detail was irrelevant to whether Cody sexually assaulted A.H. Trial counsel's performance was not deficient for failing to further explore it. This claim fails because trial counsel was not ineffective.

Cody's sixth contention is that the disparities between his testimony and A.H.'s testimony regarding what the "t-shirt treatment" meant should have been explored. A.H. testified that the "t-shirt treatment" referred to her meeting Cody without a bra on so he could fondle her. Cody testified that the "t-shirt treatment" referred to their first act of penile-vaginal intercourse. This characterization was explored and the record reveals that A.H. and Cody's testimony differed in many respects on this issue. This allegation is lacking in specificity as to what Cody's counsel should have further explored so as to reveal anything not already currently in the record.

Consequently, Cody has failed to allege sufficient facts to show his counsel's performance was deficient for failing to further pursue it. This claim fails because the claim is lacking in specificity.

Cody's seventh contention is that trial counsel was ineffective in failing to question A.H. about whether she previously stated that the first zoo incident occurred in December 2017. However, since both parties ended up testifying the incident occurred in June 2017, we fail to see how Cody could establish prejudice here. This claim fails because the claimed error was not prejudicial.

Cody's eighth contention is that "A.H. provided inconsistent testimony in her depositions to her in-court testimony that she could have been impeached. A.H's mental health record contained information that would have refuted her testimony at trial that Cody's counsel did not offer." Brief for appellant at 58. However, he does not identify what inconsistencies that trial counsel failed to explore that he vaguely alleges were in these records. Consequently, he has failed to allege sufficient facts to show that counsel's performance was deficient. This claim fails because the claim is lacking in specificity.

Cody's ninth contention is that his trial counsel failed to confront A.H. with whether she asked Cody to take her out of the hospital. However, the record revels that trial counsel could not be ineffective in failing to do so because A.H. testified that she did not recall any of that conversation. This claim fails because counsel was not ineffective.

Finally, Cody contends that "the investigation fell short of being complete." Brief for appellant at 58. In connection with this assignment, Cody specifically alleges:

> Law enforcement failed to have the purported injuries examined for consistency with her story. They failed to adequately investigate a claim that during the pendency of the case A.H. accused Cody of trying to run her off the road while she was driving an ambulance with a coworker and patient. They failed to thoroughly interview the recruits that Cody was training during the alleged timeframe. Additionally, Cody's counsel failed to cross-examine Trantham concerning the prosecutorial misconduct alleged above. Cody's counsel should have confronted Trantham with his investigative reports characterizing Cody's statements during the first controlled call differently that the State attorney made it seem through the series of leading questions.

Brief for appellant at 58-59. We understand this assignment to mean Cody's trial counsel should have further pursued these topics with the law enforcement officers called to testify. We will analyze this claim of ineffective assistance on that basis. The first portion of this claim has not been sufficiently alleged because Cody does not identify which officer should have been questioned about A.H.'s injuries or what that testimony would have established to reveal an inconsistency in A.H.'s story as it related to her claims of injury or how that ultimately related to the elements of sexual assault. Thus, the first portion of this claim fails because it is lacking in specificity.

The second portion of this claim is that "[law enforcement] failed to adequately investigate a claim that during the pendency of the case A.H. accused Cody of trying to run her off the road while she was driving an ambulance with a coworker and patient. They failed to thoroughly interview the recruits that Cody was training during the alleged timeframe." Brief for

appellant at 58-59. Again, in connection with this allegation, Cody fails to articulate what testimony would be offered here to establish an inconsistency or how that testimony would establish an inconsistency. His allegation that law enforcement "failed to thoroughly interview the recruits" simply fails to establish the requisite specificity required for an appellate court to make a determination of whether the claim can be decided upon the trial record. This portion of the claim fails for lack of specificity in pleading.

The third portion of the claim contending counsel was ineffective for failing to cross-examine Investigator Trantham governing his memory of things he heard during the controlled call. In fact, Trantham's version of the call differed somewhat from Investigator Lundgren's testimony on direct examination:

Q . . . Do you remember any specific things that Mr. Cody said during that first call?

A Yes.

Q And what are those?

A I recall that at one point he -- I remember him saying, "I'm sorry," clearly enough that I knew that he had said that. There was another point in the conversation where she was talking about that she had, you know, "What if I had talked to the nurses." I think she asked it wasn't badgering me but they were trying to ask me about you once you left, what if I talked to them. And he replied something about --

[Defense Counsel]: Judge, I'm gonna object. She's saying these are recorded statements by [Cody] that none of us can hear. They need to be [Cody's] statements, not some synopses of --

. . . .

THE COURT: All right. Sustained. Do you want to proceed?

[Prosecutor]: Yes. Thank you.

Q Investigator Lundgren, you testified that Mr. Cody responded, "I'm sorry," and then you started talking about a time when [A.H.] was talking about the nurses confronting her. What do you remember Mr. Cody saying in response to [A.H.] talking about that? What did he say?

A I remember him saying, "You're gonna end my career."

Accordingly, the record already contains evidence of different memories and versions of the same call and further questioning of Investigator Trantham on why his memory was different amounts to cumulative evidence governing the same subject matter and amounts to a matter of trial strategy. This claim fails because the record is sufficient to establish that trial counsel was not ineffective.

### (d) Failure to Introduce Evidence Discrediting A.H.

Cody's fourth claim of ineffective assistance of trial counsel is that his counsel failed to introduce evidence to discredit A.H. concerning an allegation she made against Cody that could have easily been refuted and would have revealed her lack of credibility and motive to lie. Specifically, Cody refers to the allegation made by A.H. governing an alleged attempt by Cody to run her off the road. But in our review of the record, we note that, during A.H.'s deposition,

A.H. testified that she merely believed Cody was the person who ran her off the road. Further, that incident occurred more than two months after A.H. had reported the sexual assaults and therefore, had no bearing on whether she lied about the assaults. Assuming without deciding there is some remote relevancy to this topic, trial counsel's failure to further pursue it did not prejudice Cody on this record.

### (e) Failure to Object to Jury Instructions III and IV

Cody's fifth claim of ineffective assistance of trial counsel is that his counsel failed to object to jury instructions III and IV. We have already found that Cody was not prejudiced by any error in the admission of jury instructions III and IV. Accordingly, Cody cannot show that he was prejudiced by his counsel's failure to object to this testimony. This claim fails because the alleged claim is not prejudicial.

### (f) Failure to Object to State's Alleged Prosecutorial Conduct

Cody next argues that his trial counsel was ineffective for failing to object to the State's line of questioning governing Investigator Trantham's recollection of statements made by Cody during a controlled call. The full colloquy was outlined in a previous section of this opinion governing Cody's assignment of prosecutorial misconduct. During that line of questioning, Trantham testified that he heard Cody acknowledge that certain of his sexual actions were unwanted contact and that Cody was concerned about losing his job over his actions. Cody argues Trantham's observations were different than Investigator Lundgren's observations of the same call and were somewhat inconsistent from his report which he made following the call. Cody argues that these inconsistences somehow demonstrate Trantham's recollections are inaccurate and that it was misconduct by the prosecutor to pursue them. Accordingly, Cody argues his counsel was ineffective for failing to object to this line of questioning at trial.

But contrary to this assertion, Trantham was free to recount his recollection of the call and did so at trial. If there were inconsistences between hearers of the call or the report, the jury was free to consider those inconsistencies in resolving the factual disputes in this case. In short, the prosecutor did not commit misconduct in questioning Trantham governing his memory of the call and an objection to the testimony would have been correctly overruled. As such, Cody's counsel was not ineffective for failing to object to the State's line of questioning governing Investigator Trantham's recollection of statements made by Cody during a controlled call. This claim fails because trial counsel was not ineffective.

### (g) Failure to Preserve Issues for Appellate Review

Cody's final claim of ineffective assistance of trial counsel is that his counsel failed to object to and preserve the issues for appellate review on the character evidence and evidence concerning excessive force and in inducing further evidence on excessive force. Specifically, he claims that trial counsel erred failing to object to Officer Dilsaver's testimony concerning Cody's Internal Affairs inquiries and trial counsel's "cross-examination of Dilsaver that allowed additional information to come in concerning excessive force complaints." Brief for appellant at 62.

Cody only refers to two examples in his brief of trial counsel's failure to object to testimony. The first example occurs during direct examination when the following colloquy occurs between the prosecution and Dilsaver:

Q What are some of the things somebody could get a complaint about that you have to investigate or that they could get quote written up for?

A Sure. Internal Affairs complaints -- investigates complaints related to excessive force, racial profiling, serious misconduct, violation of criminal law, things that are generally thought in lay terms to be a bigger deal than simple complaints like officer was rude or didn't do a good enough job on my investigation. Anything that would be serious misconduct related would be generally investigated by Internal Affairs.

This testimony merely consisted of background explanation of what kinds of complaints Internal Affairs investigated. Trial counsel was not ineffective in failing to object to this background testimony.

The second example mentioned by Cody in his brief is Dilsaver's comment during direct examination that "I just remember a particular complaint when he was a Southeast officer about --" but he acknowledges that Dilsaver was not allowed to finish his comment before being cut off by the prosecution. This testimony did not provide any negative information regarding Cody and thus trial counsel was not ineffective in failing to object to it. Thus, these two portions of Cody's claim fail because trial counsel was not ineffective.

The remainder of Cody's argument regarding trial counsel's alleged insufficiency in counsel's "cross-examination of Dilsaver that allowed additional information to come in concerning excessive force complaints" was not argued in his brief. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court. *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019). Thus, we decline to consider this alleged error.

## VI. CONCLUSION

For the reasons set forth, herein Cody's conviction and sentence are affirmed.

AFFIRMED.